# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 28, 2022         Decided July 28, 2023

No. 21-1038

CBOE FUTURES EXCHANGE, LLC,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

MINNEAPOLIS GRAIN EXCHANGE, LLC,
INTERVENOR

On Petition for Review of a Final Order
of the Securities and Exchange Commission

*Paul E. Greenwalt III* argued the cause for petitioner. With him on the briefs was *Michael K. Molzberger*.

*Rachel M. McKenzie*, Senior Litigation Counsel, Securities and Exchange Commission, argued the cause for respondent. With her on the brief were *Michael A. Conley*, Solicitor, and *Dominick V. Freda*, Assistant General Counsel.

*Mark T. Stancil* argued the cause for intervenor Minneapolis Grain Exchange, LLC in support of respondent.

With him on the brief were *Jeffrey B. Korn* and *Patricia O. Haynes*.

Before: SRINIVASAN, *Chief Judge*, and WILKINS and RAO, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*:  A futures contract calls for the purchase or sale of an underlying asset on a specific future date at a specific price.  When the underlying asset is a security (or a security index), the futures contract may constitute a "security future" under federal law.  A security future is subject to more stringent regulatory treatment and less favorable tax treatment than other futures.

This case involves futures contracts based on the so-called SPIKES Index, which measures the volatility of the S&P 500 stock market index.  In 2020, the Securities and Exchange Commission issued an order directing treatment of SPIKES futures as futures rather than security futures for purposes of the Securities Exchange Act.  The SEC's aim was to promote competition with futures that are based on another index that measures S&P 500 volatility, known as the VIX Index.  For years, VIX futures have been regulated as futures, not security futures.

The petition in this case challenges the SEC's 2020 order treating SPIKES futures as futures.  We grant the petition.  The SEC did not adequately explain why SPIKES futures must be regulated as futures to promote competition with VIX futures.  While we thus vacate the Commission's order, we will withhold issuance of our mandate for three calendar months to allow market participants sufficient time to wind down existing SPIKES futures transactions with offsetting transactions.

3

I.

A.

A futures contract is an "agreement[] to buy or sell a specified quantity" of a specified asset "at a particular price for delivery at a set future date." *Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 470 (1997). The assets underlying futures are often physical commodities, like oil, corn, or aluminum. After enactment of the Commodity Futures Modernization Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763A-365 (CFMA), futures contracts can also provide for the future delivery of financial securities, like shares of a stock or the value of a stock index. Depending on the particulars, such a futures contract may be treated as a "security future" under federal law.

Both the Securities Exchange Act and the Commodity Exchange Act define a "security future" as a "contract of sale for future delivery of a single security or of a narrow-based security index, including any interest therein or based on the value thereof," with certain exceptions. 7 U.S.C. § 1a(44) (Commodity Exchange Act); 15 U.S.C. § 78c(a)(55)(A) (Securities Exchange Act). The two Acts also contain an identical definition of a "narrow-based security index." 7 U.S.C. § 1a(35)(A); 15 U.S.C. § 78c(a)(55)(B). Roughly speaking, that term refers to an index based on, or heavily weighted towards, a small number of constituent securities. *See* 7 U.S.C. § 1a(35)(A)(i)–(iv); 15 U.S.C. § 78c(a)(55)(B)(i)–(iv). In contrast, more diversified indexes that track broader market segments—like the S&P 500—are considered "broad-based" indexes. Futures contracts based on broad-based indexes are not security futures. *See* 7 U.S.C. § 1a(44); 15 U.S.C. § 78c(a)(55)(A).

Because security futures reflect characteristics of both securities (normally regulated by the Securities and Exchange Commission, or SEC) and futures contracts (normally regulated by the Commodity Futures Trading Commission, or CFTC), Congress directed the SEC and the CFTC to jointly administer a bespoke regulatory regime for security futures. As a general matter, security futures are subject to more stringent regulation than other futures. The distinct regulatory regime applicable to security futures thus requires, for instance, that exchanges for trading security futures register with and submit proposed rules to both the SEC and the CFTC. Those rules include listing standards, such as the amount of collateral or "margin" necessary for a trader to secure and maintain credit for use in trading security futures. *See, e.g.*, 7 U.S.C. § 7b-1(a); 15 U.S.C. §§ 78f(g), 78f(h)(2), 78f(h)(3)(C), 78f(h)(3)(L), 78g(c)(2)(B), 78s(b)(7)(A)–(B).

The National Futures Association and the Financial Industry Regulatory Authority (FINRA)—self-regulatory bodies within the financial industry—further require that market participants dealing in security futures (but not futures contracts) provide a "Security Futures Risk Disclosure Statement" before investors may trade those products. *See Security Futures*, FINRA, https://www.finra.org/rules-guidance/key-topics/security-futures (last visited July 10, 2023) [https://perma.cc/RC8B-D642]. The Disclosure Statement is a standardized document that "discusses the characteristics and risks of standardized security futures contracts traded on regulated U.S. exchanges." FINRA & Nat'l Futures Ass'n, *Security Futures Risk Disclosure Statement* 1 (2020), https://www.finra.org/sites/default/files/2020-08/Security_Futures_Risk_Disclosure_Statement_2020.pdf [https://perma.cc/LF4S-ADJY] (Disclosure Statement).

By contrast, futures contracts—such as those based on physical commodities—are subject to more relaxed regulation, by the CFTC alone.  For instance, a market that enables futures trading can implement proposed rules after ten business days—without any need to notify the SEC—unless the CFTC acts to stay the certification.  *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.6(b).  Futures contracts also may be subject to more lenient margin requirements and capital gains tax treatment than security futures.  *See* SEC Br. 11–14; 26 U.S.C. §§ 1234B(b), 1256(a)(3).

In sum, security futures are more heavily regulated and taxed than other futures.

B.

1.

In 2003, petitioner Cboe Futures Exchange (CFE) announced plans to list futures contracts based on the Cboe Volatility Index, more commonly known as the "VIX Index." *See* Joint Order Excluding Indexes Comprised of Certain Index Options From the Definition of Narrow-Based Security Index Pursuant to Section 1a(25)(B)(vi) of the Commodity Exchange Act and Section 3(a)(55)(C)(vi) of the Securities Exchange Act of 1934, 69 Fed. Reg. 16,900, 16,900 & n.6 (Mar. 31, 2004) (2004 Order).  The VIX Index measures the 30-day expected volatility of the widely-used S&P 500 stock market index.

The following year, the SEC and the CFTC issued a joint order "exclud[ing] certain indexes comprised of options on broad-based security indexes"—including the VIX—"from the definition of the term narrow-based security index."  *Id.* at 16,900; *see* 7 U.S.C. § 1a(35)(B)(vi); 15 U.S.C. § 78c(a)(55)(C)(vi).  The effect was to exempt VIX futures from treatment as security futures.  CFE then began listing

futures based on the VIX. *See* Joint Order To Exclude Indexes Composed of Certain Index Options From the Definition of Narrow-Based Security Index Pursuant to Section 1a(25)(B)(vi) of the Commodity Exchange Act and Section 3(a)(55)(C)(vi) of the Securities Exchange Act of 1934, 74 Fed. Reg. 61,116, 61,116 n.7 (Nov. 23, 2009).

2.

The SPIKES Index is similar, but not identical, to the VIX. Both indexes measure the 30-day expected volatility of the S&P 500. But whereas the VIX is derived from the prices of options on the S&P 500 itself, the SPIKES is derived from the prices of options on the SPDR S&P 500 ETF Trust (known as the SPY), an index fund that aims to replicate the price and yield of the S&P 500. *See* Self-Regulatory Organizations; Miami International Securities Exchange, LLC; Order Granting Approval of a Proposed Rule Change To List and Trade Options on the SPIKES[TM] Index, 83 Fed. Reg. 52,865, 52,865 (Oct. 18, 2018) (SPIKES Options Order).

Intervenor Minneapolis Grain Exchange, LLC (MGEX) is a subsidiary of a company that holds a license to the SPIKES. In March 2019, MGEX, hoping to list futures based on the SPIKES, began working with the CFTC to determine whether the SPIKES is a narrow-based or broad-based index. After CFTC staff indicated to MGEX that the SPIKES, like the VIX, is a broad-based index, MGEX self-certified to the CFTC proposed rules for the listing and trading of SPIKES futures. *See* Letter from Lindsay Hopkins, Clearing House Counsel, MGEX, to Christopher J. Kirkpatrick, Sec'y of the Comm'n, CFTC (Sept. 20, 2019), https://www.mgex.com/documents /MGEXSPIKES40.2Submission_redacted_000.pdf [https:// perma.cc/EW82-6BSW]. The CFTC did not stay MGEX's

self-certification, and on November 18, 2019, MGEX began listing SPIKES futures for trading.

But less than two weeks later, on November 29, 2019, MGEX, at the request of SEC staff, notified market participants that it would halt trading in SPIKES futures later that day. In its memorandum announcing the trading halt, MGEX stated that its decision was "in the best interests of the market and market participants until the Exchange determines whether it can work with [the SEC and the CFTC] to resolve certain issues." Memorandum from Minneapolis Grain Exch. to MGEX Mkt. Participants (Nov. 29, 2019), J.A. 32.

3.

In ensuing discussions with regulators, MGEX proposed that the SEC and the CFTC issue a joint order—akin to the 2004 Order covering the VIX—excluding the SPIKES from the definition of narrow-based security index and thereby exempting SPIKES futures from treatment as security futures. MGEX submitted various materials to the two Commissions in support of that request. The Commissions did not issue the joint order requested by MGEX.

In December 2020, the SEC unilaterally issued the order under review here, which we will call the Exemptive Order. *See* Order Granting Conditional Exemptive Relief, Pursuant to Section 36 of the Securities Exchange Act of 1934 ("Exchange Act") With Respect to Futures Contracts on the SPIKES™ Index, 85 Fed. Reg. 77,297 (Dec. 1, 2020). The Exemptive Order concludes that a futures contract based on the SPIKES satisfies the definition of a security future under the Securities Exchange Act. *Id.* at 77,298 & n.20. But the Order then invokes section 36 of the Securities Exchange Act, which authorizes the SEC to "exempt any person, security, or transaction . . . from any provision" of the Securities Exchange

Act "to the extent that such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors." 15 U.S.C. § 78mm(a)(1). Exercising that authority, the Order generally exempts "futures contracts on the SPIKES from the definition of 'security future' under the Exchange Act," with certain specified exceptions. 85 Fed. Reg. at 77,298. As a result of that grant of exemptive relief, market participants can trade SPIKES futures "as . . . future[s] (and not as . . . security future[s])" as far as the Securities Exchange Act goes; MGEX need not submit its proposed rule changes to the SEC for approval; and MGEX need not "comply with listing standard requirements," "including with respect to margin," "that are specific to security futures." *Id.* at 77,300.

The Exemptive Order sets certain conditions on its grant of exemptive relief, including conditions aimed to ensure that the SPDR S&P 500 ETF Trust closely tracks the performance of the S&P 500. *Id.* The failure of any of those conditions to hold, the Order explains, "could potentially undermine the basis for providing relief." *Id.* So, "[t]o the extent that one or more of these conditions is no longer satisfied," the Order "will no longer apply three calendar months after the end of the month in which any condition is no longer satisfied." *Id.* The Order explains that "three calendar months is a sufficient amount of time to allow for" market participants to "take the necessary steps to wind down their existing transactions in an orderly fashion." *Id.*

The Exemptive Order contains a brief statement of the rationale for granting exemptive relief: it states that allowing SPIKES futures to trade as futures contracts, rather than security futures, "should foster competition as [SPIKES futures] could serve as an alternative to the only comparable incumbent volatility product in the market," i.e., VIX futures. *Id.* at 77,298–99. The Order then lists some benefits of

"[f]acilitating greater competition among these types of products," including "provid[ing] market participants with access to a wider range of financial instruments to trade on and hedge against volatility in the markets, particularly the S&P 500," and "lower[ing] transaction costs for market participants." *Id*. at 77,299.

CFE filed a petition for review of the Exemptive Order. We consider CFE's petition in this case.

II.

We review the Exemptive Order under the familiar standard of the Administrative Procedure Act, which requires us to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary" or "capricious." 5 U.S.C. § 706(2)(A). To satisfy that standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The agency's explanation must be clear enough that the agency's "path may reasonably be discerned." *Id.* (quoting *Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). And the agency may not "entirely fail[] to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

We conclude that the Exemptive Order is arbitrary and capricious because the SEC failed adequately to explain its rationale and failed to consider an important aspect of the problem. Because those deficiencies require vacatur of the Order, we have no need to consider CFE's additional contention that the SEC failed to consider the possibility that

its grant of exemptive relief would lead to confusion among market participants.

## A.

We begin with CFE's contention that the Exemptive Order fails to give an adequate explanation of why exemptive relief is necessary to achieve the goal of enhancing competition. CFE relatedly argues that the Order provides no basis for its apparent assumption that existing products do not already afford sufficient competition. We agree with CFE.

The Exemptive Order succinctly identifies the objective of enabling SPIKES futures to "trade as . . . futures contract[s], as opposed to as . . . security future[s]," through the grant of exemptive relief: to "foster competition," such that SPIKES futures "could serve as an alternative to" VIX futures, "the only comparable incumbent volatility product in the market." 85 Fed. Reg. at 77,298–99. The Order then lists certain "benefits to the market" yielded by enhanced competition, such as "lower transaction costs for market participants." *Id.* at 77,299. Critically, however, the Order contains no explanation whatsoever of how the grant of exemptive relief relates to the goal of promoting competition in the first place. Instead, the Order simply identifies that goal and asserts without elaboration that, to achieve it, SPIKES futures "will need to trade, clear, and settle as . . . futures contract[s]," rather than as security futures. *Id.*

That assertion does not adequately "explain why [the SEC] decided to act as it did." *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010). The Order must articulate a "rational connection" between the treatment of SPIKES futures as futures (rather than security futures) and the promotion of competition. *Encino Motorcars*, 579 U.S. at 221 (quotation marks and citation omitted). Yet the Exemptive Order gives

no reason why exempting SPIKES futures from requirements applicable to security futures is likely to—let alone necessary to—promote competition.  To be sure, VIX futures have been regulated as futures rather than security futures for some time (although the Exemptive Order never expressly says even that). Still, the Order needs to contain some explanation of why SPIKES futures, to provide meaningful competition, must also be regulated as futures rather than security futures.  Without some account of the competitive import of the differences between those two regulatory regimes, the Order does nothing to address the possibility that SPIKES futures could provide meaningful competition even if treated as security futures.

Relatedly, the Exemptive Order fails to explain why no existing products meaningfully compete with "the only comparable incumbent volatility product in the market."  85 Fed. Reg. at 77,299.  Indeed, the Exemptive Order does not even identify the "incumbent volatility product" by its name or characteristics, although all parties acknowledge that the phrase refers to VIX futures.  And the Order likewise fails to explain what it means for a product to be "comparable" to that incumbent or what characteristics a product must have to compete effectively with that incumbent.  To the extent the Order could be read to consider the relevant market of "comparable" products to be volatility *futures* (as opposed to all volatility products, including volatility *security futures*), it still invites the question:  why is that the relevant market?  That is, why is it that only volatility futures, and not other volatility products (including security futures), can meaningfully compete with other volatility futures?  In short, the Order leaves too many key questions unanswered to satisfy the APA. *See, e.g.*, *Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 446–47 (D.C. Cir. 2017); *Select Specialty Hosp.-Bloomington, Inc. v. Burwell*, 757 F.3d 308, 309, 312–14 (D.C. Cir. 2014).

The SEC maintains that certain materials MGEX presented to the SEC and the CFTC in connection with its request for a joint exemptive order adequately identified a connection between exemptive relief and competition. Regardless of the content of the cited analyses, which are under seal, they cannot rescue the SEC's otherwise inadequate explanation in the Exemptive Order.

We have previously rejected an attempt by the SEC to substitute "unquestioning reliance" on a regulated entity's submissions for the "reasoned analysis" the APA requires. *Susquehanna*, 866 F.3d at 447. Such submissions, we explained, have "'little' supporting value" because they express "the 'self-serving views of the regulated entit[y].'" *Id.* (alteration in original) (quoting *NetCoalition v. SEC*, 615 F.3d 525, 541 (D.C. Cir. 2010), *superseded by statute on other grounds as stated in NetCoalition v. SEC*, 715 F.3d 342 (D.C. Cir. 2013)). If the SEC wanted to rely on MGEX's analyses to connect the grant of exemptive relief with the goal of promoting competition, it needed to "critically review[]" and adopt MGEX's submissions or "perform[] its own" comparable analysis. *In re NTE Conn., LLC*, 26 F.4th 980, 988 (D.C. Cir. 2022) (alterations in original) (quoting *Susquehanna*, 866 F.3d at 447). But the SEC nowhere in the Exemptive Order—or anywhere else in the record—explains "*why* [it] found" MGEX's analyses "persuasive" or independently makes the same points. *Id.*

The SEC's brief in our court ultimately relies on the notion that "there are competitive advantages to trading as a future, rather than a security future"—specifically, more lenient tax treatment and lower margin requirements. SEC Br. 35. MGEX's brief makes similar points. *See* MGEX Br. 16, 19. But we of course base our review on the "grounds invoked by the agency" in the administrative record, *Calcutt v. FDIC*, 143

S. Ct. 1317, 1318 (2023) (per curiam) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)), not later rationales contained in briefing in our court. Even if a need to equalize the tax treatment and margin requirements applicable to SPIKES futures and VIX futures could, in theory, justify the grant of exemptive relief, the record contains no indication that the SEC in fact relied on that rationale in the Exemptive Order.

The Order simply contains no mention at all of taxation. And although it references margin requirements once in passing, it merely observes that, as a result of the relief granted, SPIKES futures will be subject to the listing standards applicable to futures rather than security futures, "including with respect to margin." 85 Fed. Reg. at 77,300. Nothing in the Order suggests that exemptive relief will foster competition because of the effect on margin requirements. Tellingly, the SEC's brief in our court, apart from its references to MGEX's submissions (which, again, the SEC never itself adopted), relies entirely on sources outside the administrative record— from a law review article to Internal Revenue Service publications—to support the notion that equalization of tax and regulatory treatment is necessary to promote competition. *See* SEC Br. 12–14. There is no indication in the administrative record that the grant of exemptive relief is based on the reasoning the SEC now offers in its brief. That kind of "*post hoc* litigation rationalization pressed by agency counsel" cannot save the Exemptive Order. *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 804 (D.C. Cir. 2022).

Finally, the SEC posits that, because the Order is an exercise of informal adjudication—"the administrative law term for agency action that is neither the product of formal adjudication or a rulemaking," *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001)—the Order need not set forth fulsome explanations on all material points.

But even though "[w]e have what is known as informal agency adjudication," the SEC still must "explain why it decided to act as it did" by providing a "statement . . . of reasoning" rather than a mere "conclusion." *Butte Cnty.*, 613 F.3d at 194 (quotation marks and citation omitted). The SEC, for the reasons explained, fails to clear that minimal bar here.

B.

We turn next to CFE's argument that the SEC did not adequately address potential harms to investors arising from the Exemptive Order's implications for the Security Futures Risk Disclosure Statement. Recall that the Order, before granting exemptive relief, concludes that SPIKES futures meet the statutory definition of security futures. 85 Fed. Reg. at 77,298. That determination would ordinarily require securities dealers to provide investors seeking to trade SPIKES futures with the Disclosure Statement, which describes security futures and the risks associated with trading them. *See* Self Regulatory Organizations; Order Granting Approval to Proposed Rule Change by the National Association of Securities Dealers, Inc. Relating to the Security Futures Risk Disclosure Statement, 67 Fed. Reg. 70,993, 70,994 (Nov. 27, 2002) (Disclosure Statement Order). CFE argues that, while the Exemptive Order effectively jettisoned that requirement for SPIKES futures, the SEC failed adequately to examine the potential resulting harms to SPIKES futures investors. We agree.

An agency need not address every conceivable implication of its decision. But a "statutorily mandated factor, by definition, is an important aspect of any issue before an administrative agency." *United Parcel Serv., Inc. v. Postal Regul. Comm'n*, 955 F.3d 1038, 1050–51 (D.C. Cir. 2020) (quotation marks and citation omitted). And with respect to the exemptive relief granted here, the Securities Exchange Act

required the SEC to consider the public interest and the protection of investors. *See* 15 U.S.C. § 78mm(a)(1).

The SEC considered the same two factors two decades ago when it approved a rule requiring securities dealers to provide the Disclosure Statement to security futures investors. At that time, the SEC found that requirement "consistent" with its statutory mandates to "protect investors and the public interest." Disclosure Statement Order, 67 Fed. Reg. at 70,994; *see* 15 U.S.C. § 78o-3(b)(6). In light of that prior finding, the SEC needed to "acknowledge" and "offer a reasoned explanation" for its evident change of perspective in the Exemptive Order—which, in contrast with the previous order, effectively discarded the Disclosure Statement requirement for a product meeting the statutory definition of a security future. *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017). Neither the Exemptive Order nor the record, however, contains any mention of the Disclosure Statement.

The SEC does not dispute that it needed to consider the harms that could result from dispensing with the general requirement to provide the Disclosure Statement to investors in security futures. Instead, the SEC maintains that the Order adequately addresses those potential harms, albeit implicitly. The Order does so, the SEC reasons, by establishing exceptions to and conditions on exemptive relief that serve to protect investors from fraud and market manipulation and to ensure that SPIKES futures trade in a way that minimizes risk.

At least with respect to the Exemptive Order's exceptions, however, they do nothing to undercut the rationale for providing the Disclosure Statement to SPIKES futures investors. The Order's exceptions preserve the application to SPIKES futures of anti-fraud, anti-manipulation, recordkeeping, and inspection requirements that generally

apply to security futures. *See* 85 Fed. Reg. at 77,297, 77,299–300. So even if the Order's exceptions, by preserving those requirements, serve to limit risks associated with fraud and manipulation, those requirements would apply to precisely the same extent even absent the grant of exemptive relief. Yet in that situation, securities dealers still would have been obligated to provide SPIKES futures investors with the Disclosure Statement: that obligation applies to all security futures, regardless of their risk level.

It is far from clear, moreover, that the Exemptive Order's exceptions and conditions in fact minimize the risks addressed in the Disclosure Statement. The SEC's brief points only to the risk that "prices of security futures contracts may not maintain their customary or anticipated relationships to the prices of the underlying . . . index." SEC Br. 49 (quoting Disclosure Statement at 6). The Exemptive Order may plausibly minimize that risk—it "contains a number of conditions designed to protect investors should a tracking error between the SPY and its underlying index materialize." 85 Fed. Reg. at 77,302. But it is hard to see—and the SEC does not explain—how the Order's exceptions and conditions address myriad other risks discussed in the Disclosure Statement's forty-plus pages. To take just one example, the exceptions and conditions do nothing to mitigate the general need for an investor in SPIKES futures to have "knowledge of both the securities and the futures markets," nor the risks associated with trading without such knowledge. Disclosure Statement at 6.

The SEC falls back on separate disclosures that SPIKES futures investors will receive under the CFTC regulations that "will govern every aspect of [SPIKES futures] on a day-to-[day] basis." Exemptive Order, 85 Fed. Reg. at 77,300. The suggestion is that those required disclosures for futures, *see* 17 C.F.R. § 1.55(b), fill any void left by the Disclosure

Statement's absence. For instance, the futures disclosures provide warnings about the risk of loss and the difficulty of liquidating a position, comparable to similar warnings in the Disclosure Statement. *Compare id.* § 1.55(b)(1), (b)(9), *with* Disclosure Statement at 4–5.

The Exemptive Order, however, never mentions the futures disclosures. And at any rate, those disclosures only partially fill the void left by the absence of the Disclosure Statement. As with the Exemptive Order's exceptions and conditions, the futures disclosures do not address any number of matters covered by the Disclosure Statement. And even when the two sets of disclosures overlap, the Disclosure Statement tends to provide much greater detail than the futures disclosures. *Compare, e.g.*, 17 C.F.R. § 1.55(b)(11) ("The high degree of leverage (gearing) that is often obtainable in futures trading because of the small margin requirements can work against you as well as for you. Leverage (gearing) can lead to large losses as well as gains."), *with* Disclosure Statement at 25–28 (making the same basic point over the course of several paragraphs, including an explanation of margin requirements and numerical examples).

For those reasons, we conclude that the Exemptive Order's failure adequately to consider the potential harms to investors from discarding the obligation to provide the Disclosure Statement was arbitrary and capricious.

## III.

The Exemptive Order's shortfalls require its vacatur. In general, "vacatur is the normal remedy," although we can remand to the agency without vacatur in certain circumstances. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). "The decision whether to vacate depends on 'the seriousness of the order's deficiencies (and thus the extent of

doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" *Susquehanna*, 866 F.3d at 451 (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). The SEC and MGEX urge us to exercise our discretion to remand without vacatur. We decline to do so because they have not shown that vacatur would be so disruptive as to justify a departure from our normal course.

In contending that vacatur would be unduly disruptive, the SEC and MGEX point to the Exemptive Order's recognition that, "to the extent that the exemptions in this order are no longer effective, market participants will need time to take the necessary steps to wind down their existing transactions in an orderly fashion, which typically requires entering into offsetting transactions." 85 Fed. Reg. at 77,300. To that end, the Order provides that, "[t]o the extent that one or more of" the Order's conditions "is no longer satisfied," the Order "will no longer apply three calendar months after the end of the month in which any condition is no longer satisfied." *Id.* In the SEC's judgment, that "is a sufficient amount of time to allow for such activity to occur." *Id.* Notably, Congress made essentially the same judgment in the CFMA, which provides for a similar three-month grace period when changes to a broad-based security index's composition cause it to become narrow-based (thereby causing futures based on that index to be reclassified as security futures). *See* 15 U.S.C. § 78c(a)(55)(E).

The concerns with assuring adequate time for investors to unwind transactions do not counsel against ordering vacatur altogether. Rather, they are consistent with granting vacatur but building in a grace period akin to the one established by the SEC and Congress. Accordingly, we will vacate the Exemptive Order but will withhold issuance of our mandate,

pursuant to Rule 41(b) of the Federal Rules of Appellate Procedure, to provide a three-month period during which market participants can wind down their open transactions. *See Chamber of Com. v. SEC*, 443 F.3d 890, 909 (D.C. Cir. 2006) (withholding issuance of mandate for ninety days pursuant to Rule 41(b)). Our mandate will issue three calendar months after the end of the calendar month in which we enter judgment, except that, if a timely petition for rehearing or motion for stay of mandate is filed, the mandate will issue three calendar months after the end of the calendar month in which we may deny such a petition or motion.

\*　　\*　　\*　　\*　　\*

For the foregoing reasons, we grant the petition for review and vacate the Exemptive Order. We withhold issuance of our mandate as set forth in this opinion.

*So ordered.*