# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 6, 2025   Decided February 10, 2026

No. 25-1091

AFFIRMED ENERGY, LLC,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

MONITORING ANALYTICS, LLC, AND PJM INTERCONNECTION,
LLC,
INTERVENORS

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Seth P. Waxman* argued the cause for petitioner. With him on the briefs were *Kyle T. Edwards*, *Kelly P. Dunbar*, *David M. Levine*, and *Megan Gardner*.

*Jared Fish*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *David L. Morenoff*, Acting General Counsel, *Robert H. Solomon*, Solicitor, and *Susanna Y. Chu*, Senior Attorney.

*John L. Shepherd Jr.* argued the cause for respondent-intervenors. With him on the brief were *Blake Grow*, *Johnson Mihaly*, *Christopher O'Hara*, and *Jeffrey W. Mayes*.

Before: HENDERSON and PAN, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

Opinion dissenting in part filed by *Circuit Judge* PAN.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The issue presented by petitioner Affirmed Energy LLC (Affirmed) is whether the Federal Energy Regulatory Commission (FERC) permissibly approved a tariff amendment prohibiting companies from bidding Energy Efficient Resources (EERs) in capacity auctions. The auctions are run by PJM Interconnection LLC (PJM), the entity responsible for managing the electrical grid in portions of thirteen States and the District of Columbia. At the auctions, PJM purchases commitments to supply electrical capacity to its grid. With FERC's permission, PJM allowed providers of EERs, which continuously reduce electrical consumption, to bid EER projects at its auctions. In other words, EERs could treat their resources as commitments to *supply* electricity, rather than to *reduce* electrical consumption, and could bid those commitments at the auctions. If PJM accepted an EER provider's bid, PJM permitted that provider to bid the same project at up to three more auctions. PJM permitted this action in part to offset a four-year lag between when EER projects became operational and when PJM's statistical model, known as a load forecast, could capture those projects' effects on energy consumption. Although PJM had since 2009 allowed providers to bid EERs at its auctions, it proposed to sunset that permission in 2024, explaining that its updated load forecast

fixed the four-year lag. FERC accepted the proposed tariff amendment. It found that the amendment would reduce costs for end-use customers without compromising grid reliability. One EER provider, Affirmed, now petitions for review of FERC's orders.

Affirmed contends that FERC violated the filed-rate doctrine by retroactively divesting it of the right to participate in at least two more capacity auctions. It also argues that FERC's orders were arbitrary and capricious because FERC uncritically accepted PJM's updated load forecast, overlooked reliance interests based on the existing tariff and ignored that tariff's substantial benefits. We disagree with both claims. FERC's orders were not impermissibly retroactive under our caselaw because the amendment applied solely to future capacity auctions. FERC critically reviewed PJM's updated forecast and explained why the forecast was fit for its intended purpose. And it acknowledged that its decision might upset reliance interests and reduce incentives to invest in EERs but it explained that those costs were outweighed by other considerations.

## I.  Background

### A.  PJM's Electrical Grid

In the 1935 Federal Power Act (FPA), the Congress charged FERC (then, the Federal Power Commission) with superintending the interstate sale of electricity. Federal Power Act of 1935, ch. 687, pt. II, 48 Stat. 838, 847 (codified as amended at 16 U.S.C. § 824 *et seq.*). Under that authority, FERC oversees entities, known as Regional Transmission Organizations (RTOs), which manage the electrical grid in their respective regions. *Pub. Citizen, Inc. v. FERC*, 7 F.4th 1177, 1186 (D.C. Cir. 2021). RTOs carry out several key

responsibilities, which include "operating the grid in particular geographic areas, . . . balancing supply and demand, and ensuring a reliable transmission system." *Id.* PJM is an RTO. Off. of Pub. Participation, Fed. Energy Regul. Comm'n, *An Introductory Guide for Participation in PJM Processes* 2 (2025). To discharge its responsibilities, PJM hosts capacity auctions at least once each year. *See Morgan Stanley Cap. Grp. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 554 U.S. 527, 537 (2008). At the auctions, PJM purchases commitments to supply its grid with electrical capacity for a future delivery year, usually more than three years ahead. *See* PJM, *2025/2026 Base Residual Auction Report* 1, 4 (2024).

The capacity auctions work in this way: Providers bid the price they will accept in exchange for their promise to supply electricity. *See Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 155 (2016). PJM uses those bids, in conjunction with its estimate of demand, to set a "clearing price" for the auction. *PJM Power Providers Grp. v. FERC*, 96 F.4th 390, 395 (3d Cir. 2024). Any provider who submits a bid below (*i.e.*, "clears") the clearing price will receive that price in exchange for its commitment to provide electricity. *Talen Energy Mktg.*, 578 U.S. at 155–56. PJM continues to purchase capacity commitments until it satisfies projected demand (known as the reliability requirement). *Id.*

EERs—including efficient light bulbs and appliances—have posed a unique problem for capacity auctions. The reason is simple: EERs reduce the amount of capacity that PJM must procure at each auction. For example, if a consumer installs a more efficient refrigerator, he will, all else being equal, consume less electricity. *Use of Energy Explained*, U.S. Energy Info. Admin. (Jan. 12, 2024), https://www.eia.gov/ energyexplained/use-of-energy/efficiency-and-conservation.php [https://perma.cc/5G9P-SL4N]. And the difference between his

old and new consumption constitutes electricity that PJM no longer needs to procure at auction. For many years, however, PJM could not capture the effects of EERs in the statistical model it uses to predict demand—its "load forecast." J.A. 120, Gledhill Aff. ¶¶ 16–17. To account for EERs at all, then, PJM needed to do so at its capacity auctions, by permitting EER providers to bid their projects as commitments to provide electricity.

Since 2009, PJM has allowed EER providers to participate in its auctions. *See PJM Interconnection, L.L.C.*, Order Accepting Tariff Provisions in Part, 126 FERC ¶ 61,275, PP 120, 131 (2009) (2009 Order). Central to Affirmed's petition are two tariff provisions that FERC approved in 2009. First, Section L.1 of PJM's tariff defines eligible EERs. Its definition encompasses only projects that continuously reduce electrical consumption and that are not already reflected in the load forecast:

> An Energy Efficiency Resource is a project . . . designed to achieve a continuous . . . reduction in electric energy consumption at the end-use customer's retail site that is not reflected in the peak load forecast prepared for the Delivery Year for which the Energy Efficiency Resource is proposed . . . .

J.A. 60. Second, Section L.4 establishes the time frame in which an EER provider can bid a particular project:

> An Energy Efficiency Resource that clears an auction for a Delivery Year may be offered in auctions for up to three additional consecutive Delivery Years, but shall not be assured of clearing in any such auction . . . .

J.A. 61. In other words, Section L.4 permits EER providers to bid an EER project in up to four consecutive auctions—the initial auction at which the project clears and three more. PJM chose this four-auction time frame in part to match the four-year lag in its load forecast. 2009 Order, 126 FERC ¶ 61,275, P 132. With FERC's permission, PJM added these provisions to its tariff on file with FERC, as well as to its contracts with providers in its region.

The four-year lag did not remain for long. In 2016, PJM deployed a model that, in theory, fixed the lag. To achieve this goal, PJM incorporated "end-use intensity values," which it obtained from the Energy Information Administration (EIA), a statistical entity within the U.S. Department of Energy. J.A. 118, 120–21, Gledhill Aff. ¶¶ 6–7, 18. End-use intensity measures a technology's "relative use over time" and it has two critical features. J.A. 121, Gledhill Aff. ¶ 20. The first is "saturation," or the proportion of all homes and commercial floorspaces with the technology. J.A. 121, Gledhill Aff. ¶ 20. The second is "efficiency," or the reduction in electrical usage the technology produces. J.A. 121, Gledhill Aff. ¶ 20. With these forward-looking data available, PJM concluded, it could capture the effects of EERs without the lag.

This development posed an issue for grid reliability. Because PJM accounted for EERs both in its load forecast and at its auctions, PJM wound up double counting their effects on electrical consumption. To illustrate: Assume that EER projects reduce the number of megawatts (MW) that end-use customers consume by 20 in a given delivery year. If PJM forecasted a demand of 100 MW for that year, its projection would account for those 20 MW of energy efficiency. In other words, but-for its updated modeling, PJM would have forecasted demand for 120 MW. Assume further that PJM

purchased commitments from EER providers to provide 20 MW of capacity for the same delivery year. In this hypothetical, PJM would purchase only 80 MW of actual capacity compared to its reliability requirement of 100 MW. Thus, by double counting the effects of EERs, PJM risked obtaining less capacity than it needed.

To counteract that risk, PJM introduced an "addback" mechanism. For each MW attributable to EERs that "cleared" at auction, PJM added one MW to its reliability requirement. In other words, if PJM predicted that it needed to obtain 100 MW for a given delivery year and it obtained 20 of those MW from EERs at auction, PJM would shift its reliability requirement from 100 MW to 120 MW. In this way, PJM ensured that EER providers' participation did not prevent it from purchasing enough capacity.

Although the addback promoted grid reliability, the reliability came at a price: The addback required the utilities and, ultimately, end-use customers within PJM's region to shoulder the costs of capacity payments for EERs without benefiting from a corresponding reduction in the reliability requirement. As PJM put it, the addback was "at odds with the notion that resources being paid capacity rates should actually provide capacity." J.A. 34–35. Accordingly, in September 2024, PJM proposed to "prospectively sunset" EERs' auction eligibility, beginning with July 2025's auction for the 2026/27 delivery year. J.A. 1. PJM submitted a filing under section 205 of the FPA, seeking permission to amend Section L of the tariff to reflect that change. The proposed amendment stated that no EERs would "qualify" for the auctions "beginning with the 2026/2027 Delivery Year." J.A. 59.

Given its updated load forecast, PJM explained in an accompanying letter, it had determined that EER participation

raised costs for consumers without incrementally reducing the reliability requirement. It observed that capacity payments for EERs had proven increasingly onerous, cresting at $144 million for the 2025/26 delivery year alone. And it noted that its decision was backed by a supermajority of its stakeholders and was the product of nearly one year's deliberation.

To support its filing, PJM submitted an affidavit from one of its managers. The manager provided a detailed overview of PJM's load forecast, as well as its plan to exclude EERs from the auctions. For example, he identified the source of PJM's data underlying its load forecast. PJM acquires publicly available data from the EIA, he noted, comprising both historical energy usage (from the EIA's Form EIA-861M) and prospective energy usage (from its Annual Energy Outlook). PJM then supplements those data with information obtained from outside vendors. In recent years, he observed, PJM has acquired supplemental data on "behind-the-meter solar and electric vehicle charging trends." J.A. 118, Gledhill Aff. ¶ 7. He also discussed how the load forecast functioned. PJM ran regression models for different sectors, he explained—residential, commercial and industrial. It finetuned those models on the basis of variables affecting electrical consumption, like historical weather patterns, peak shaving, behind-the-meter storage and data-center activity. In its load forecast for 2024, for example, PJM produced "377 forecast scenarios for every hour" of the year based on variability in weather alone. J.A. 120, Gledhill Aff. ¶ 15.

The manager also explained that PJM met with stakeholders and outside consultants to refine its load forecast. One meeting with a third-party consultant, Itron, Inc., led to a publicly available report on PJM's forecast. The manager also pointed out that various PJM stakeholder groups, including its

Load Analysis Subcommittee and Planning Committee, meet periodically to evaluate and provide input on the forecast.

Finally, the manager supplied two pieces of evidence that the load forecast did, in fact, capture EERs. First, for delivery year 2023/24, PJM's predicted peak load was lower than its actual peak load. Second, and relatedly, a recent short-term forecast had exceeded an older, long-term forecast for the 2024/25 delivery year. If the load forecast had in fact failed to capture EERs, the manager opined, both results should have flipped. The long-term forecast would be *higher* than the short-term forecast and actual peak load because the latter two metrics are more accurate and, hence, more likely to capture EERs. These patterns confirmed, in the manager's view, that the forecast captured EERs accurately. He acknowledged that the forecast was "not so granular as to track" any individual EER project but he concluded that it could "reasonably capture[]" the EERs' aggregate effects on electrical consumption. J.A. 125, Gledhill Aff. ¶ 35.

On the basis of its letter and its manager's affidavit, PJM requested that FERC approve its amendment.

## B. Affirmed's Claim

Affirmed does not sell or manufacture EERs itself. Instead, Affirmed "contracts with manufacturers, retailers, and distributors" of EERs "in exchange for the contractual rights to the capacity reductions from those energy efficient products." Pet'r's Br. add. 10, Abram Decl. ¶ 6. Affirmed then "aggregates the expected future energy capacity reductions from those products" and participates in capacity auctions, offering "commitments to reduce energy consumption" in exchange for capacity payments in PJM's region. Pet'r's Br. add. 9–10, Abram Decl. ¶¶ 4–7. It then passes along a portion

of those payments to EER manufacturers and retailers. Stated simply, Affirmed's business model runs on capacity payments. If EERs are excluded from the auctions, Affirmed will be left without a material source of revenue. Affirmed bid projects at the 2023/24 and 2024/25 delivery-year auctions. Its bids cleared at each auction. Under Section L.4 of the tariff, then, Affirmed planned to bid those projects in at least the 2026/27 and 2027/28 delivery-year auctions.

In response to PJM's filing seeking the above-described tariff amendment, Affirmed submitted a protest.[1] In it, Affirmed highlighted several "deficiencies" in PJM's proposal that, it asserted, warranted FERC's rejection. J.A. 162. Among other things, Affirmed criticized PJM's updated load forecast, challenging PJM's evidence that the model accurately captured EERs. And it contended that PJM's proposal would, if approved, retroactively divest it of the right to participate in the 2026/27 and 2027/28 delivery-year auctions.

FERC approved PJM's amendment. *PJM Interconnection, L.L.C.*, Order Accepting Tariff Revisions, 189 FERC ¶ 61,095, P 1 (2024) (Order). FERC determined that the amendment reduced costs for consumers without compromising PJM's grid reliability and was therefore just and reasonable under FPA section 205. *Id.* P 63; 16 U.S.C. § 824d(a). And it noted that Section L.4's *raison d'être*—the four-year lag in the load forecast—no longer existed. Order, 189 FERC ¶ 61,095, P 62. Thus, FERC allowed PJM to exclude EERs from its auctions, starting with the July 2025 auction.

---

[1] A protest is distinct from a petition for rehearing. Anyone can protest a tariff filing. 18 C.F.R. § 385.211(a)(1). A petition for rehearing, among other things, preserves arguments for judicial review. 16 U.S.C. § 825*l*(b).

FERC also addressed the protestors' arguments. Order, 189 FERC ¶ 61,095, P 64. In response to the argument that FERC's order operated retroactively, FERC concluded that its order applied wholly prospectively, beginning with the July 2025 auction for the 2026/27 delivery year. *Id.* P 71. And although its decision could upset providers' expectations, as some protestors had contended, FERC believed that the benefits of its decision outweighed those costs. *Id.* P 72. PJM would continue to honor existing capacity commitments, FERC pointed out, and the record lacked evidence about the extent to which PJM's proposal would undercut sunk investments. *Id.*

In response to other arguments, FERC conceded that PJM's forecast might not perfectly capture the EERs' effects on demand. Order, 189 FERC ¶ 61,095, P 69. But it determined that the forecast would "reasonably" capture those effects. *Id.* It found the forecast reliable because PJM incorporated publicly available data widely relied on in the industry and refined its forecast through meetings with outside consultants and stakeholders. *Id.*

Finally, FERC rejected the argument that the benefits of EER participation were necessary to achieve just and reasonable rates. Order, 189 FERC ¶ 61,095, P 70. FERC recognized that capacity payments might "increase incentives to invest" in EERs. *Id.* But it did not view those incentives as "necessary to ensure just and reasonable rates," particularly because PJM would continue to account for EERs in its load forecast and, hence, its reliability requirement. *Id.*

One month after FERC accepted the amendment, Affirmed moved for a stay and petitioned for rehearing. *See* 5 U.S.C. § 705; 16 U.S.C. § 825*l*. In its motion, Affirmed argued that FERC's order posed an existential threat to its operations,

leaving it saddled with $50 million in sunk investments and forcing it to cease operations once it met its obligations for the 2025/26 delivery year.

In January 2025, FERC denied Affirmed's rehearing petition by failing to decide it within 30 days. *PJM Interconnection, L.L.C.*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, 190 FERC ¶ 62,005 (2025). It stated that it would address the substance of Affirmed's rehearing petition and stay motion in a future order. *Id.*

The following month, FERC issued an order explaining its rationale. *PJM Interconnection, L.L.C.*, Order Addressing Arguments Raised on Rehearing and Denying Stay, 190 FERC ¶ 61,081, P 1 (2025) (Rehearing Order). FERC elaborated on its rationale for concluding, among other things, that PJM's load forecast captured the effects of EERs, *id.* PP 31–34, and that the benefits of its decision outweighed the harm to existing reliance interests, *id.* PP 36–38. It noted that Section L.1 of the tariff put providers on notice that improvements to the forecast might render their projects ineligible for the auctions, which, in turn, diminished the providers' reasonable reliance interests. *Id.* P 38.

Affirmed filed petitions for review of all three orders. PJM moved to intervene, as did the Independent Market Monitor on PJM's behalf, and we granted both motions.

## II.  Analysis

We have jurisdiction of Affirmed's petition, 16 U.S.C. § 825*l*(b), and we review *de novo* the claim that FERC violated the filed-rate doctrine, *SFPP, L.P. v. FERC*, 967 F.3d 788, 802 (D.C. Cir. 2020) (per curiam). We review Affirmed's

remaining claims under the Administrative Procedure Act's arbitrary-and-capricious standard. 5 U.S.C. § 706(2)(a). Under that standard, we will uphold an agency's decision if it is "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency's decision is arbitrary and capricious if the agency entirely fails to consider an important aspect of the problem before it or ignores the reasonable reliance interests of regulated parties. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–32 (2020). An agency's decision is also arbitrary and capricious if it merely rubberstamps a regulated party's analysis. *Susquehanna Int'l Grp., LLP v. Sec. & Exch. Comm'n*, 866 F.3d 442, 447 (D.C. Cir. 2017).

In its petition, Affirmed contends that FERC's orders violated the filed-rate doctrine by retroactively divesting Affirmed of the right to participate in at least two more capacity auctions. Affirmed also asserts that FERC's orders were arbitrary and capricious for three reasons: First, FERC impermissibly rubberstamped PJM's load forecast instead of critically reviewing PJM's analysis or conducting its own; second, FERC unreasonably discounted the benefits of EER participation; and third, FERC failed to consider the EERs' reliance interests. We consider each argument in turn.

**A.**

Affirmed contends that FERC's orders violate the filed-rate doctrine. It asserts that it obtained the right under Section L.4 to bid at the 2026/27 and 2027/28 delivery-year auctions when its bids cleared at the 2023/24 and 2024/25 delivery-year auctions. And FERC's orders, it maintains, retroactively divested it of that tariff-based right. It bases its argument on the Supreme Court's decision in *Landgraf v. USI Film Products*, which deemed retroactive laws that "attach[] new

legal consequences to events completed before their enactment," or which "take[] away or impair[] vested rights acquired under existing laws." 511 U.S. 244, 269–70 (1994) (citation modified).

We interpret tariff provisions according to their "plain meaning." *Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821, 827 (D.C. Cir. 2021). We do not doubt that under Section L.4's plain meaning, Affirmed obtained permission to bid at up to four consecutive auctions. Our only concern is whether FERC properly approved PJM's revocation of that permission.

The answer to that question lies in the filed-rate doctrine or its corollary, the rule against retroactive ratemaking. The filed-rate doctrine prohibits a utility from charging "any rate other than the one on file with the Commission." *Verso Corp. v. FERC*, 898 F.3d 1, 10 (D.C. Cir. 2018) (quoting *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 12 (D.C. Cir. 2014)). And the rule against retroactive ratemaking prohibits a utility from "set[ting] rates to recoup past losses" and FERC from "prescrib[ing] rates on that principle." *City of Piqua v. FERC*, 610 F.2d 950, 954 (D.C. Cir. 1979) (quoting *Nader v. FCC*, 520 F.2d 182, 202 (D.C. Cir. 1975)); *accord Pub. Serv. Co. of N.H. v. FERC*, 600 F.2d 944, 958 (D.C. Cir. 1979) ("A rate designed to recoup past losses is retroactive and illegal."). The bar on retroactive ratemaking is a "corollary" of the filed-rate doctrine, precluding FERC "from doing indirectly what it cannot do directly"—that is, allowing a utility to collect a rate other than the filed rate. *SFPP, L.P.*, 967 F.3d at 801–02 (quotations omitted). These rules are "not limited to rates *per se* but also extend[] to matters directly affecting rates." *Okla. Gas & Elec. Co.*, 11 F.4th at 829 (citation modified).

In the domain of interstate electricity, we have based these rules on the FPA's text. Section 205 of the FPA requires

utilities to file tariffs with FERC "reflecting the rates they charge and the related rules." *Cent. Hudson Gas & Elec. Corp. v. FERC*, 138 F.4th 531, 533 (D.C. Cir. 2025) (citing *Hecate Energy Greene Cnty. 3 LLC v. FERC*, 72 F.4th 1307, 1309–10 (D.C. Cir. 2023)); 16 U.S.C. § 824d(c). And section 206 empowers FERC, with exceptions not relevant to this petition, to "fix rates and charges, but only prospectively." *Towns of Concord, Norwood & Wellesley v. FERC*, 955 F.2d 67, 72 (D.C. Cir. 1992); 16 U.S.C. § 824e(a).

Affirmed characterizes its filed-rate claim as a challenge to retroactive ratemaking. Because neither PJM nor FERC has attempted to impose something other than the rate on file, we agree that Affirmed's claim is best conceptualized as one of retroactivity, to the extent that these rules diverge in practice. *See Associated Gas Distribs. v. FERC*, 898 F.2d 809, 810 (D.C. Cir. 1990) (mem.) (per curiam) (Williams, J., concurring in the denial of rehearing and rehearing en banc).

Our precedent makes clear that FERC's orders were not impermissibly retroactive. We have upheld an agency's authority to impose a new auction rule, even if that rule divested regulated parties of a permission they had obtained under an earlier regime. *DIRECTV, Inc. v. FCC*, 110 F.3d 816 (D.C. Cir. 1997). In *DIRECTV*, we considered whether the Federal Communications Commission (FCC) retroactively divested petitioners of the right to acquire satellite channels surrendered by another party. *Id.* at 825–26. The FCC had granted permits to several applicants to construct satellites. Those permits came subject to certain requirements, including an obligation to begin operating within six years of receiving the permit. *Id.* at 822 (quoting 47 C.F.R. § 100.19(a)). By order, the FCC afforded the permittees a "reservation[]," granting them the "first right" to a pro-rata share of any channel of a surrendered or cancelled permit. *Id.* (quotation omitted).

When the FCC canceled one permit, however, it decided to auction off the permittee's fifty-one channels instead. *Id.* at 823.

Several permittees filed petitions, contending that the FCC's new auction rule was impermissibly retroactive. Like Affirmed, they argued that the FCC's new auction rule "divest[ed] them each of [a] right" "that they had been given in the [earlier] order." *DIRECTV*, 110 F.3d at 825. We analyzed the permittees' claim there, as Affirmed asks us to do here, under the Supreme Court's decision in *Landgraf*, which deems retroactive those laws that "impair rights a party possessed when he acted." 511 U.S. at 280. Still, we rejected the permittees' arguments. We recognized that the permittees "may reasonably have expected that, under the" first order, "they would receive a pro rata portion of any channels the [FCC] reclaimed." *DIRECTV*, 110 F.3d at 826. But that order did not, we concluded, foreclose it from taking a different approach moving forward. Indeed, the FCC's order "was itself entirely prospective: it set forth what the FCC intended to do if a certain condition were to arise, which it later did." *Id.* In view of these circumstances, we concluded that the new auction rule was not retroactive.[2]

---

[2] The partial dissent distinguishes *DIRECTV* principally on the ground that the FCC had "never implemented" its binding order. Partial Dissenting Op. 14. In our view, that distinction does not matter. An agency's progress towards implementing a guarantee says very little about whether that guarantee existed in the first place—or, more relevant here, whether a subsequent decision retroactively erased that guarantee. Rather, an agency's progress speaks to, if anything, the existence and strength of any reliance interests—an issue we have consistently analyzed under other doctrines, including secondary retroactivity, *e.g.*, *Bd. of Cnty. Comm'rs of Weld*

*DIRECTV* is no outlier.  We have iterated its basic holding in similar contexts.  In *National Cable & Telecommunications Ass'n v. FCC*, for example, the FCC banned exclusivity contracts between cable operators and multiple-dwelling units. 567 F.3d 659, 661–62 (D.C. Cir. 2009) (*NCTA*).  It also prohibited cable companies from enforcing existing exclusivity contracts.  *Id.* at 662.  Petitioners argued that the FCC's decision to outlaw existing exclusivity contracts operated retroactively.  *Id.* at 670.  We rejected that assertion, however, concluding that the decision was not retroactive because it did "not render[] past actions illegal or otherwise sanctionable," even if it "impaired the future value of past bargains."  *Id.*

Similarly, in *Mobile Relay Associates v. FCC*, we upheld the FCC's rebanding decision, in which it reconfigured a portion of the radio band.  457 F.3d 1, 3 (D.C. Cir. 2006).  One petitioner argued that the FCC retroactively impaired the right it had obtained at auction to operate a licensed radio system in the future.  *Id.* at 10.  The petitioner equated the FCC's decision with selling a "10-year timber" lease, "collecting the ten years of rent in advance, and then, one year into the ten-year term," prohibiting timber extraction.  Pet'r's Br. at 31–32, *Mobile Relay Assocs.*, 457 F.3d 1 (No. 04-1413).  We declined to set aside the decision as retroactive, holding that its effects were "purely prospective" even if they unsettled the petitioner's reliance interests.  *Mobile Relay Assocs.*, 457 F.3d at 11.  We also observed that an order "is not retroactive" if it "alters the

---

*Cnty. v. Env't Prot. Agency*, 72 F.4th 284, 295–96 (D.C. Cir. 2023), and the Administrative Procedure Act's arbitrary-and-capricious standard, *e.g.*, *MediNatura, Inc. v. Food & Drug Admin.*, 998 F.3d 931, 940–41 (D.C. Cir. 2021).

future effect" but "not the past legal consequences of an action." *Id.* (citation modified).[3]

Consistent with this understanding of retroactivity, we see nothing impermissibly retroactive about FERC's decision. Affirmed reasonably expected that it would be allowed to bid in at least two more auctions. But that expectation did not transform FERC's forward-looking orders into retroactive ratemaking. An order that merely "upsets expectations based on prior law is not retroactive." *NCTA*, 567 F.3d at 670 (quoting *Mobile Relay Assocs.*, 457 F.3d at 11). Nor is an order that simply "alters the future effect" of a party's conduct. *Mobile Relay Assocs.*, 457 F.3d at 11. FERC's orders undoubtedly altered Affirmed's eligibility for future auctions—a "future effect," as *Mobile Relay* put it. *Id.* But that is all they did. They did not strip Affirmed of its "past eligibility." *Ass'n of Accredited Cosmetology Schs. v. Alexander*, 979 F.2d 859, 864 (D.C. Cir. 1992). They did not force Affirmed to return the "payments [it] had received" from earlier auctions.[4] *Id.* And they did not render Affirmed's "past

---

[3] There is nothing unique about the broadcast or communications fields that would preclude us from applying these cases to define retroactivity. Many of our foundational cases in this context drew guidance from FCC precedent in defining retroactivity. *E.g.*, *City of Piqua*, 610 F.2d at 954 (quoting *Nader*, 520 F.2d at 202); *Pub. Serv. Co.*, 600 F.2d at 957 (same). And we have observed that, as a general matter, courts apply the filed-rate doctrine "across the spectrum of regulated utilities." *NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 800 (D.C. Cir. 2007) (quotation omitted).

[4] This is one of the reasons that we find unpersuasive the partial dissent's reliance on *Arkema Inc. v. Environmental Protection Agency*, 618 F.3d 1 (D.C. Cir. 2010). The *Arkema*

actions illegal or otherwise sanctionable." *NCTA*, 567 F.3d at 670. They were therefore not retroactive.

Fortifying this conclusion, Section L.4 is "itself entirely prospective." *DIRECTV*, 110 F.3d at 826. The provision "set forth what [PJM] intended to do" once a provider's bid cleared at an auction. *Id.* But the occurrence of that condition did not create regulatory gridlock—not even, as Affirmed claims, for two more capacity auctions. *Id.* "To conclude otherwise would hamstring" FERC in exercising its statutory prerogative to accept just and reasonable tariffs. *Mobile Relay Assocs.*, 457 F.3d at 11. Because FERC's orders are not retroactive under our caselaw, they do not violate the rule against retroactive ratemaking.

The partial dissent challenges our reliance on FCC caselaw in defining retroactivity, contending that it is crucial to pay careful attention to the underlying statute—here, the FPA. Partial Dissenting Op. 13, 17. We agree: The critical question is whether FERC violated the FPA's rule permitting only prospective changes to the filed rate.[5] But to answer that

---

Court made clear that the agency's 2010 rule was retroactive because it allowed the agency to undo transactions that were completed in 2008 and 2009. 618 F.3d at 7, 10. Laws that nullify past transactions are quintessentially retroactive. *See Landgraf*, 511 U.S. at 268–69, 280. Here, by contrast, Affirmed will keep all of the payments it received from the 2023/24 and 2024/25 delivery-year auctions. *See* Order, 189 FERC ¶ 61,095, P 72.

[5] No one—not Affirmed, not us and not the partial dissent—has identified a more specific, text-based rule that FERC could have violated here.

question, it is first necessary to define "retroactivity," which is why we draw guidance from caselaw on that matter.

Moreover, we cannot help but point out that the partial dissent's precedent of choice, *Arkema Inc. v. Environmental Protection Agency*, 618 F.3d 1 (D.C. Cir. 2010), has nothing to do with either the FPA or the filed-rate doctrine. *See* Partial Dissenting Op. 17–18. *Arkema* instead involved an Environmental Protection Agency (EPA) rulemaking; the effective bar on retroactivity there arose from the Clean Air Act, 42 U.S.C. § 7671f, together with the Supreme Court's "clear statement" rule from *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208 (1988). *Arkema*, 618 F.3d at 7. Why those sources should be more analogous to the FPA than the FCC sources eludes us.

At bottom, we agree with the partial dissent that it can be difficult to parse "the difference between a 'past entitlement' and a mere 'expectation.'" Partial Dissenting Op. 12. Despite our dissenting colleague's undeniable thoroughness and eloquence, however, we remain convinced that this petition calls for nothing more than a straightforward application of precedent.

**B.**

Next, Affirmed argues that FERC's orders are arbitrary and capricious because FERC failed to critically evaluate PJM's load forecast. Because that forecast provided the basis of PJM's filing, Affirmed asserts, FERC had to—but did not—either critically review PJM's analysis or conduct its own.

If an agency relies on a regulated party's analysis to justify its decision, it must either critically review that analysis or perform its own. *Susquehanna Int'l Grp.*, 866 F.3d at 447.

"[U]nquestioning reliance" on the submission does not suffice. *Bloomberg L.P. v. Sec. & Exch. Comm'n*, 45 F.4th 462, 473 (D.C. Cir. 2022) (quoting *Susquehanna Int'l Grp.*, 866 F.3d at 447). Nor may an agency "simply summarize[]" the party's argument "in broad strokes" and then "announce" that it is persuaded. *In re NTE Conn., LLC*, 26 F.4th 980, 988 (D.C. Cir. 2022). Instead, if the agency decides not to perform its own analysis, it must "adopt" the party's submission and "explain[] why" it finds the submission "persuasive." *Cboe Futures Exch., LLC v. Sec. & Exch. Comm'n*, 77 F.4th 971, 979 (D.C. Cir. 2023) (citation modified).

Here, FERC critically reviewed PJM's load forecast and explained why it found the submission persuasive. FERC acknowledged that there would "inevitably" be some daylight between PJM's load forecast and the actual effects of EERs on electrical consumption. Order, 189 FERC ¶ 61,095, P 69. But it determined that the forecast could reasonably capture those effects, for several reasons.[6]

First, the forecast uses reliable data. Order, 189 FERC ¶ 61,095, P 69; Rehearing Order, 190 FERC ¶ 61,081, P 32. As FERC explained, the forecast incorporates data from multiple sources, including "publicly available data" from the EIA, a unit within the U.S. Department of Energy, whose data are widely used in the industry. Order, 189 FERC ¶ 61,095, P 69; *accord* Rehearing Order, 190 FERC ¶ 61,081, PP 32–33. PJM then supplements the EIA data with data acquired from

---

[6] For some of its discussion, FERC incorporated by reference portions of the manager's affidavit, as it was entitled to do. *Christian Broad. Network, Inc. v. Copyright Royalty Tribunal*, 720 F.2d 1295, 1306 (D.C. Cir. 1983); *see Colo. Interstate Gas Co. v. Fed. Power Comm'n*, 324 U.S. 581, 595 (1945).

other sources. Order, 189 FERC ¶ 61,095, P 69; Rehearing Order, 190 FERC ¶ 61,081, PP 32–33. These additional data encompass variables like historical weather patterns, behind-the-meter battery use, electric-vehicle charging, solar-energy use and data-center activity. *See* Rehearing Order, 190 FERC ¶ 61,081, P 32 nn.83–84 (citing, *inter alia*, Gledhill Aff. ¶¶ 10, 13–15). The reliability of these data, FERC determined, weighed in favor of finding the forecast reliable. Order, 189 FERC ¶ 61,095, P 69; Rehearing Order, 190 FERC ¶ 61,081, P 32.

Second, the forecast employs a plausible mechanism to capture EERs without the four-year lag. PJM incorporates end-use intensity values, FERC explained, which track a technology's use over time and its efficiency. Rehearing Order, 190 FERC ¶ 61,081, P 32 & n.85 (citing Gledhill Aff. ¶¶ 16–23). In other words, the values project "growing efficiency," meaning the greater the impact of an EER project, the "lower the end-use intensity." J.A. 121, Gledhill Aff. ¶¶ 20–21. FERC recognized that these values helped close the gap between the date EER projects become operational and when the projects are reflected in the forecast. Order, 189 FERC ¶ 61,095, PP 62, 65; Rehearing Order, 190 FERC ¶ 61,081, P 32.

Third, PJM refines its model on the basis of feedback from shareholders and outside consultants. Order, 189 FERC ¶ 61,095, P 69 & n.163 (citing Gledhill Aff. ¶¶ 6–11). Various groups within PJM periodically review the load forecast, including its Load Analysis Subcommittee and Planning Committee. J.A. 119, Gledhill Aff. ¶ 10. PJM also commissioned a publicly available report from outside consultant Itron, Inc. J.A. 119, Gledhill Aff. ¶ 11. And after Itron published its report, it met with the Load Analysis Subcommittee to evaluate the forecast. J.A. 119, Gledhill Aff.

¶ 11.  In FERC's view, these expert consultations also weighed in favor of crediting the forecast.  Order, 189 FERC ¶ 61,095, P 69; Rehearing Order, 190 FERC ¶ 61,081, P 32.

Fourth, other metrics confirmed that the forecast did not significantly underestimate the effects of EERs.  Rehearing Order, 190 FERC ¶ 61,081, P 33 & n.91 (citing Gledhill Aff. ¶¶ 33–34).  The relationship between recent load forecasts on the one hand and the observed load and short-term forecast on the other corroborated the load forecast's reliability, FERC concluded.  *Id.* P 33 n.91 (citing Gledhill Aff. ¶¶ 33–34).  As PJM's manager had explained, those relationships would have flipped if the model had seriously underestimated the effects of EERs.  J.A. 124–25, Gledhill Aff. ¶¶ 33–34.  Weighing all of this evidence, FERC determined that "PJM's improved load forecast reasonably accounts for energy efficiency measures." Rehearing Order, 190 FERC ¶ 61,081, P 31.

We believe FERC met its duty to critically review PJM's submission.  It carefully described the submission and explained why the submission was suitable for its intended purpose.  Far from "rubberstamp[ing]" PJM's analysis, FERC fully explained why it "found [that] evidence persuasive." *In re NTE Conn.*, 26 F.4th at 988.  Measured against our deferential standard of review, FERC's analysis was, we believe, more than satisfactory.

Affirmed, however, emphasizes that FERC did not have access to the statistical methodology underlying PJM's load forecast and so it questions FERC's ability to evaluate accurately the forecast.  Affirmed mistakes the level of granularity that our caselaw imposes.  "There is no support" for the assertion that an "untested" and "uncorroborated" affidavit "cannot constitute substantial evidence." *EchoStar Commc'ns Corp. v. FCC*, 292 F.3d 749, 753 (D.C. Cir. 2002); *see also*

*Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 683–84 (D.C. Cir. 1984) ("When the arbitrary or capricious standard is performing that function of assuring factual support, there is no *substantive* difference between what it requires and what would be required by the substantial evidence test . . . ."). Tellingly, it cites no precedent in which we have required a regulated party to disclose an underlying statistical model before the agency can adopt the party's analysis. And Affirmed's objection is especially inapt where, as here, PJM has commissioned a publicly available report on its methodology and has provided a detailed affidavit discussing how that methodology works. *See Am. Whitewater v. FERC*, 125 F.4th 1139, 1153 (D.C. Cir. 2025) ("Absent evidence to the contrary, FERC was entitled to rely on representations by parties who were uniquely in a position to know the relevant information." (citation modified)).

Affirmed also contends that FERC failed to grapple with several aspects of the EIA's data that rendered the data unsuitable for the load forecast. For example, Affirmed alleges that the EIA fails to account for certain kinds of EERs, overestimates energy consumption and has warned against using its analyses as a forecast. Even if Affirmed is right on the facts, the EIA data were, as FERC noted, just "one input" for a model that, on the whole, it found reliable. Rehearing Order, 190 FERC ¶ 61,081, P 33. And it acknowledged that the load forecast might not perfectly capture EERs' expected effects. Order, 189 FERC ¶ 61,095, P 69. But because load forecasting is "inherently uncertain" and PJM's proposal cut costs without sacrificing reliability, FERC concluded that PJM had adequately supported its proposal. Rehearing Order, 190 FERC ¶ 61,081, PP 33–34. We find nothing unreasoned in that explanation.

Finally, Affirmed highlights that FERC framed many of its observations in the third person—"PJM described," or "PJM explained." Pet'r's Br. 45 (citation modified). In Affirmed's view, this language calls into question whether FERC in fact adopted PJM's submission as its own or simply summarized PJM's arguments. We disagree. FERC most probably employed the third person as acknowledging that PJM carried the burden of showing its proposal was just and reasonable. *See* 16 U.S.C. § 824d(e); *City of Winnfield v. FERC*, 744 F.2d 871, 877 (D.C. Cir. 1984). Its analysis confirms that understanding. In describing the evidence supporting the forecast, FERC stated, "We also . . . find that PJM has met its burden to show that its proposal will result in just and reasonable rates" and that the "forecast reasonably accounts for" EERs. Rehearing Order, 190 FERC ¶ 61,081, P 31; *accord id.* P 33.

## C.

Affirmed also asserts that FERC failed to consider an important aspect of the problem before it—namely, the benefits of EER participation. Affirmed maintains that EER providers use the revenue they receive from capacity auctions to further incentivize the production and sale of EERs. The loss of that revenue, Affirmed says, will diminish EER growth as a matter of "economics 101." Pet'r's Br. 48. Yet, it contends, FERC entirely ignored this consequence of its decision.

It is well settled that an agency's action is arbitrary and capricious if it "entirely fail[s] to consider an important aspect of the problem" before it. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *accord Ohio v. EPA*, 603 U.S. 279, 293 (2024) ("An agency cannot simply ignore an important aspect of the problem." (citation modified)). The agency may, however, recognize a

problem but conclude that the problem is mitigated, or its costs outweighed, by other considerations. *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1217 (D.C. Cir. 2004).

We conclude that FERC has met this standard. FERC acknowledged that its decision could reduce the incentives to invest in EER projects. It also noted that "providing capacity payments" for EERs "may increase incentives to invest" in EERs but that those incentives were not "necessary to ensure just and reasonable rates in PJM." Order, 189 FERC ¶ 61,095, P 70. PJM would continue to capture EERs "on the demand side," FERC emphasized, thereby reducing both the resource requirement and the corresponding capacity payments. *Id.* FERC was thus aware of and considered any blunting of incentives. *Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 91 (D.C. Cir. 2020). But FERC properly "face[d] the trade-off" inherent in its decision and determined that "the trade-off was worth it." *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 956 F.2d 321, 323–24 (D.C. Cir. 1992) (emphasis omitted). In so doing, it balanced conflicting factors as it is sometimes required to do in enforcing the FPA. *See Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 184 (D.C. Cir. 2022).

In a variation on the same theme, Affirmed maintains that FERC's response was internally inconsistent. *See World Shipping Council v. Fed. Mar. Comm'n*, 152 F.4th 215, 221 (D.C. Cir. 2025) (An agency's decision is unreasoned if it is "internally inconsistent." (quotation omitted)). Affirmed highlights three statements that, in its view, are inconsistent. First, FERC disclaimed reliance on PJM's theory that there was *no* relationship between capacity payments and EER investment. Second, FERC recognized that capacity payments might incentivize investment in EERs. Third, FERC

determined that the amendment would not undercut grid reliability.

These statements are not inconsistent. In the first, FERC meant to qualm any fears that it had adopted PJM's position that there was *no* relationship between the proliferation of EERs and capacity payments. Order, 189 FERC ¶ 61,095, P 27. PJM had, after all, argued that "the proliferation of energy efficiency projects in the PJM Region is *entirely unrelated to capacity payments*." J.A. 38 (emphasis added). Picking up on that theme, protestors argued that PJM's proposal unfairly imposed a "strict causation standard" on them alone. Order, 189 FERC ¶ 61,095, P 27. For example, one protestor contended that PJM required it to "somehow demonstrate" that it "caused" a customer to purchase an EER product and that its receipt of capacity payments was "the reason" for the purchase.[7] Protest of Advanced Energy Management Alliance, FERC Dkt. ER 24-2995, at 18 (Sep. 27, 2024). FERC rejected that implication. Instead, it clarified that its decision did "not depend on [PJM's] assertions [about] the link between capacity market payments and [EER] investments." Order, 189 FERC ¶ 61,095, P 66 n.149. In other words, FERC declined to accept PJM's hardline stance that there was no relationship at all between capacity payments and EER investment. That position, however, is perfectly consistent with FERC's comment that capacity payments might incentivize EER investment.

---

[7] Because only Affirmed petitioned for rehearing, we of course do not review the substance of the other protestors' arguments. 16 U.S.C. § 825*l*(a). We consider those arguments only to contextualize the statements that Affirmed alleges are inconsistent.

The third statement is also consistent with FERC's other positions. FERC recognized the potential incentive effect of capacity payments for EERs. But it does not follow that removing that incentive would necessarily outweigh the benefits of the tariff amendment or render the grid unreliable. As Affirmed itself points out, FERC believed the amendment would not undermine grid reliability. There is no statement in the orders to the contrary. FERC iterated time and again that the amendment would lower costs without compromising grid reliability. *See, e.g.*, Order, 189 FERC ¶ 61,095, PP 63, 72; Rehearing Order, 190 FERC ¶ 61,081, P 34. Affirmed might disagree with FERC's prediction but its disagreement does not render FERC's orders internally inconsistent.

Affirmed also contends that FERC failed to recognize and explain its change of position from 2009. At the time, FERC opined that EERs were a "critical part" of the energy market. 2009 Order, 126 FERC ¶ 61,275, P 130. Now, by sanctioning PJM's attempt to exclude EER providers, FERC has, Affirmed argues, done a *volte face*. We reject this contention as well. Without opining on the merits of the claim, we note that Affirmed did not include the claim in its request for rehearing and so it is forfeit. *See* 16 U.S.C. § 825*l*; *Ameren Servs. Co. v. FERC*, 893 F.3d 786, 793 (D.C. Cir. 2018) (discussing the FPA's "unusually strict exhaustion requirement" (citation modified)).

**D.**

Finally, Affirmed argues that FERC overlooked its reliance interests. Providers like Affirmed structured their business models around capacity payments, it asserts. And Affirmed had invested $50 million in EERs that it planned to bid at the 2026/27 and 2027/28 delivery-year auctions. In Affirmed's view, FERC failed to contend with the fact that its

decision erased Affirmed's existing investments and its business model.

The governing legal principles are not in dispute. An agency is not precluded from changing its position. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–15 (2009). But when it does, it must "assess whether there [are] reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33. Put another way, an agency must be "cognizant" of the reliance interests its decision might upset and "explain[] its good reasons" for moving forward anyway. *MediNatura, Inc. v. Food & Drug Admin.*, 998 F.3d 931, 943 (D.C. Cir. 2021) (citation modified). It falls to the agency to decide whether any reliance interests are outweighed by other factors. *Regents*, 591 U.S. at 32.

Viewed through this lens, FERC's decision was reasonable and, hence, permissible. FERC recognized the reliance interests at stake, weighed their significance and reasonably concluded that any harm to those interests was outweighed by other considerations. *See Cap. Power Corp. v. FERC*, 156 F.4th 644, 650 (D.C. Cir. 2025).

First, FERC acknowledged that its decision might undermine existing reliance interests. It noted that providers might have expected that their EERs would be eligible for four years when deciding to invest. Order, 189 FERC ¶ 61,095, P 72. But in its view, several factors diminished the gravity of those reliance interests. The tariff did not grant providers an entitlement that PJM could not change moving forward. *Id.* The tariff also did not guarantee that any EER would *clear* at the auction and thus generate revenue for the provider. *Id.* And Section L.1 tempered the reliance interests, FERC explained, because it expressly tied eligibility to PJM's load forecast and

thereby put EER providers on notice that EERs' eligibility might end. Rehearing Order, 190 FERC ¶ 61,081, P 38. In addition, PJM intended to honor existing capacity obligations, it noted, ensuring that providers received some return on their investments. Order, 189 FERC ¶ 61,095, P 72. Finally, FERC concluded that the record did not disclose the extent to which providers had already recouped their investments. *Id.* FERC emphasized, for example, that Affirmed did not disclose how much, if not all, of its $50 million outlay it had already recovered. Rehearing Order, 190 FERC ¶ 61,081, P 51.

Having appraised the reliance interests at stake, FERC explained why its decision was nonetheless reasonable. FERC determined that PJM's proposal would produce "a more efficient capacity market" by reducing the reliability requirement and, hence, the capacity payments ultimately borne by consumers. Order, 189 FERC ¶ 61,095, P 72. And it would do this without compromising grid reliability. *Id.* FERC concluded that these benefits "outweigh[ed] the possible harm" its decision might cause. *Id.* It highlighted several considerations that diminished the weight of the reliance interests. *See MediNatura*, 998 F.3d at 942–43 (analyzing factors that diminished or overcame reliance interests). And it underscored that PJM would continue to honor existing capacity commitments, which meant that providers' investments would not be rendered worthless. Where, as here, the agency has recognized and reasonably balanced the reliance interests at stake, we do not replace its judgment with our own. *Regents*, 591 U.S. at 32; *see NCTA*, 567 F.3d at 671.

Affirmed contends that FERC missed the mark when it weighed the amendment's prospectiveness, as well as the lack of any clearing guarantee, in appraising its reliance interests. In Affirmed's view, these points did not answer its argument that it had reasonably relied on Section L.4 for the right to

participate in at least two more capacity auctions. Affirmed misconceives FERC's analysis. FERC expressly acknowledged that providers like Affirmed may have expected that their EERs would be eligible for four consecutive capacity auctions. Order, 189 FERC ¶ 61,095, P 72. It considered the amendment's prospective nature and the lack of any clearing guarantee for a different reason—"to properly define the scope of the reliance interests at stake." Rehearing Order, 190 FERC ¶ 61,081, P 37. In FERC's view, these factors diminished the interests' significance, permitting it to conclude that they were outweighed by other considerations.

Affirmed also maintains that FERC unreasonably discounted its $50 million investment in EER projects that it intended to bid at the 2026/27 and 2027/28 delivery-year auctions. It repeatedly highlighted those sunk investments before the agency, Affirmed asserts, but FERC nonetheless faulted it for failing to show the extent to which FERC's decision would thwart its expectations, or how much of the $50 million it had already recouped. FERC permissibly counted that lack of evidence against Affirmed. Once it had determined that PJM showed the amendment was just and reasonable—a determination that Affirmed has not challenged—FERC reasonably faulted Affirmed for failing to respond with persuasive rebuttal evidence. *Evergy Kan. Cent., Inc. v. FERC*, 77 F.4th 1050, 1056 (D.C. Cir. 2023). It noted that the record did not reflect the degree to which the amendment would thwart existing investments. Order, 189 FERC ¶ 61,095, P 72. It did not dispute that Affirmed had invested in EERs but it observed that Affirmed had not stated whether it had already recouped its investment. Rehearing Order, 190 FERC ¶ 61,081, P 51. Recoupment was no remote possibility: EER providers received more than $140 million in capacity payments for the 2025/26 delivery year alone. *Id.* P 50 n.163. And the projects that Affirmed planned to bid at the 2026/27

and 2027/28 delivery-year auctions had already cleared at least one auction, generating some revenue for Affirmed. FERC permissibly weighed this lack of evidence when considering the reliance interests at stake.

* * *

For the foregoing reasons, the petition for review is denied.

*So ordered.*

PAN, *Circuit Judge*, dissenting in part:

PJM Interconnection, LLC ("PJM") is a regional transmission organization that manages the wholesale market for electricity in the Mid-Atlantic and Midwestern regions of the United States. PJM conducts auctions to ensure adequate electricity capacity to meet demand. Its auction procedures are governed by a tariff that the Federal Energy Regulatory Commission ("FERC" or the "Commission") must approve.

In 2009, PJM amended its tariff to authorize suppliers of Energy Efficiency Resources ("EERs") to participate in its capacity auctions. To incentivize EER bidding, the tariff guaranteed that if an EER "cleared" an auction (*i.e.*, if the bid were accepted), it could also be offered in the next three auctions. Although previously cleared EERs were not assured of clearance in the subsequent auctions, the opportunity for the EER providers to participate was valuable: So long as the subsequent bids were low enough, the EERs would "clear" those auctions too and thus would generate additional payments to the providers. EER providers factored that possibility into their pricing of energy-efficiency projects and into their bidding strategies in auctions.

Under the multi-year eligibility rule, the clearing of an EER in a PJM capacity auction was a legally significant event: The initial clearance conferred on the EER's purveyor an entitlement to participate in the next three auctions. That entitlement was protected by the filed-rate doctrine, which constrains PJM's ability to change its tariff, and the retroactivity doctrine, which prohibits FERC from altering the legal consequences arising out of a past action.

Affirmed Energy, LLC ("Affirmed") is a provider of EERs in PJM's region. Affirmed's EERs cleared PJM's auctions for the 2023/24 and 2024/25 delivery years. It therefore was entitled to bid those EERs in the 2026/27 and 2027/28 delivery-

year auctions. But before that could happen, PJM amended its tariff in 2024 to bar EERs from all auctions, effectively changing the filed rate on which Affirmed relied, and retroactively stripping Affirmed of an entitlement that the tariff had conferred. Because I disagree with my colleagues' conclusion that the 2024 tariff amendment did not retroactively alter Affirmed's eligibility to bid its EERs in specific future auctions, I respectfully dissent from Section II.A of the court's opinion. I join the court's holding that the 2024 amendment was not otherwise arbitrary and capricious.

## I.   Background

The Federal Power Act ("FPA" or the "Act") grants FERC the authority to regulate "the transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b)(1). The Act charges the Commission with ensuring that electricity rates — including all "rules and regulations affecting or pertaining to such rates" — are "just and reasonable" and not "undu[ly] prejudic[ial]." *Id.* § 824d(a)–(b). Regulated entities that manage the transmission and sale of electricity must file with FERC "schedules showing all rates and charges for any transmission or sale . . . and the classifications, practices, and regulations affecting such rates and charges." *Id.* § 824d(c). FERC must publish those proposed rates and regulations. *Id.* Once filed, a rate cannot be changed without following notice-and-comment procedures. *Id.* § 824d(d) ("[N]o change shall be made . . . in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public."); *id.* § 824d(e) (allowing third parties to submit protests challenging proposed rates and rules). FERC may change unjust and unreasonable rates and rules, but it may do so only prospectively. *Id.* § 824e(a); *see also Okla. Gas & Elec. Co. v.*

*FERC*, 11 F.4th 821, 829 (D.C. Cir. 2021) ("FERC has no authority under the Act to allow retroactive change in the filed rates." (cleaned up)).

To carry out its statutory duties, FERC has tasked regional transmission organizations ("RTOs") with coordinating the transmission of electricity and managing the wholesale markets within their respective regions. *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 267 (2016). PJM is one such RTO. At least once a year, PJM administers competitive auctions to procure capacity from electricity-generating suppliers. "Capacity is not actual electricity," but rather "a commitment to produce electricity or forgo the consumption of electricity" in a future delivery year. *Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 659 (D.C. Cir. 2017). Because capacity "auctions determine the wholesale rates of energy in interstate commerce, they are subject to Commission oversight." *XO Energy MA, LP v. FERC*, 77 F.4th 710, 714 (D.C. Cir. 2023). PJM therefore must file with FERC a tariff that sets forth the governing rules for its capacity auctions. *Id.*; 16 U.S.C. § 824d(c).

In PJM's capacity auctions, suppliers bid the price they are willing to accept in exchange for committing to provide electricity in a future delivery year. PJM accepts or "clears" bids starting with the lowest rate that is offered until it has procured enough capacity to meet its projected demand — commonly referred to as its projected "load." All accepted bids receive the highest accepted rate, known as the "clearing price." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 156 (2016). PJM typically administers its auctions three years before the target delivery year. In doing so, it relies on a "load forecast" model to predict "the amount of capacity that needs to be procured" for that delivery year. J.A. 118 (Gledhill Aff. ¶ 5).

In 2009, FERC approved a PJM tariff that authorized EER providers to bid the projected energy savings from their resources as capacity in PJM's auctions. *PJM Interconnection, LLC*, 126 FERC ¶ 61,275 at P 130 (2009) (the "2009 Order"). Under that 2009 tariff, EERs played a unique role in PJM's capacity market. Unlike power-generating suppliers that commit to producing electricity, EER suppliers — like Affirmed — commit to reducing energy consumption in PJM's region.

Affirmed contracts with manufacturers, retailers, and distributors of energy-efficient products to provide per-unit compensation for each energy-efficient product that is sold. In exchange, the program partners give Affirmed "the contractual rights to the capacity reductions from those energy[-]efficient products." Affirmed Add. 10 (Abram Decl. ¶ 6). Those capacity reductions comprise the EERs that Affirmed bids at a capacity auction. The payments that Affirmed makes to its program partners for the sale of energy-efficient products incentivize the partners to increase their sales of such products. If Affirmed's EERs clear at the capacity auction, Affirmed receives the clearance price from PJM. The dollar amounts at issue are significant: In PJM's auction for the 2024/25 delivery year, EER suppliers like Affirmed received more than $100 million in revenue for cleared EER bids.

The instant petition for review concerns, in relevant part, Section L.4 of PJM's 2009 tariff. Section L.4 provides that an EER that clears a capacity auction may be offered in the next three consecutive auctions:

> [An] Energy Efficiency Resource that clears
> an auction for a Delivery Year may be
> offered in auctions for up to three additional

consecutive Delivery Years, but shall not be
assured of clearing in any such auction . . . .

J.A. 61.[1]

In its 2009 Order approving PJM's tariff, FERC confirmed
that "PJM's proposal would allow an [energy-efficient]
resource to bid into the auction, and if it is accepted, to bid for
an additional three consecutive years." 126 FERC ¶ 61,275 at
P 131. FERC's approval of that provision rested on two policy
considerations. First, as the majority explains, PJM adopted
the multiple-auction rule to address the four-year lag between
when consumers installed energy-efficient products and when
PJM's load forecast model accounted for the corresponding
reduction in energy demand. *Id.* at P 132. Second, FERC also
approved the tariff provision to make it more likely that EER
suppliers would receive additional payments for their positive
contributions. Unlike power generators that produce electricity
each year, energy-efficient products continuously reduce
energy demand and capacity needs in PJM's region over time.

---

[1] Another provision of the 2009 tariff, Section L.1, defines an
EER as follows:

> An Energy Efficiency Resource is a project . . .
> designed to achieve a continuous . . . reduction in
> electric energy consumption at the end-use
> customer's retail site that is not reflected in the
> peak load forecast prepared for the Delivery Year
> for which the Energy Efficiency Resource is
> proposed, and that is fully implemented at all
> times during such Delivery Year, without any
> requirement of notice, dispatch, or operator
> intervention.

J.A. 60.

Consider, for example, a consumer who has installed an energy-efficient refrigerator in her home. That refrigerator will continuously reduce the homeowner's energy consumption over multiple years and, as a result, will lower the expected energy demand that PJM's capacity auction must meet. When FERC approved the participation of EERs in PJM's auctions, it expressly acknowledged that "energy efficiency is a permanent reduction in load . . . ." *Id.* at P 136. Section L.4 was intended to "allow energy efficiency resources that clear in [an] auction to receive . . . capacity payments for up to four consecutive Delivery Years." *Id.* at P 121. That benefit to EER suppliers reflected FERC's view that EER projects served "a critical part of efficient energy markets, and should be treated comparably to other types of resources, by being allowed to participate in base residual auctions and be paid the auction clearing price when they are accepted in the auction." *Id.* at P 130.

Since 2014, Affirmed has bid its EERs in nearly thirty auctions. In preparation for the auctions, Affirmed "calculate[d] and aggregate[d] the expected future energy capacity reductions" from its energy-efficiency projects and, in turn, bid those capacity reductions in PJM's auctions. Affirmed Add. 10 (Abram Decl. ¶ 7). PJM reviewed and approved Affirmed's calculation "methodologies" to verify that its energy-efficiency projects had, in fact, reduced the expected capacity load. *Id.*; *see also* 2009 Order, 126 FERC ¶ 61,275 at P 121.

From 2022 to 2024, Affirmed invested $50 million to incentivize the purchase and installation of energy-efficient products, and to acquire the contractual rights to the attendant capacity reductions. Affirmed then bid the energy savings from those products in PJM's auctions for the 2023/24 and 2024/25 delivery years. Affirmed's EERs cleared both

auctions. As a result, the operative tariff guaranteed Affirmed the opportunity to bid the continued energy savings from those EERs in PJM's 2025/26, 2026/27, and 2027/28 delivery-year auctions.

But before Affirmed could bid its EERs in the 2026/27 and 2027/28 delivery-year auctions, PJM changed course. In 2024, PJM proposed a tariff amendment that barred EERs from its capacity auctions altogether. Specifically, its 2024 amendment declared that "no Energy Efficiency Resources shall qualify to be offered into the [capacity] Auctions beginning with the 2026/2027 Delivery Year." J.A. 94. The proposed amendment rendered Affirmed ineligible to bid its EERs in the 2026/27 and 2027/28 delivery-year auctions, even though its EERs had cleared the 2023/24 and 2024/25 delivery-year auctions.[2]

Affirmed submitted a protest opposing PJM's 2024 tariff amendment. In relevant part, Affirmed argued that because its EERs cleared the 2023/24 and 2024/25 delivery-year auctions, Affirmed had secured the right to bid its EERs in up to three additional consecutive capacity auctions, under the operative tariff. Affirmed objected that PJM's proposed tariff amendment would divest Affirmed of its entitlement to bid its EERs in the 2026/27 and 2027/28 delivery-year auctions. FERC nevertheless approved the 2024 tariff amendment as applied to Affirmed's previously cleared EERs, concluding that the original multi-year eligibility provision did not

---

[2] PJM justified the change by explaining that its improved load forecast model could now incorporate the expected energy savings from energy-efficient products. As the majority explains, PJM was entitled to change its policy regarding EERs, and its tariff amendment was not arbitrary and capricious. I focus here on the retroactive effects of the change on Affirmed's right to participate in future auctions after its EERs cleared the 2023/24 and 2024/25 delivery-year auctions.

preclude PJM from implementing "forward-looking revisions to Energy Efficiency Resources' eligibility more broadly." *PJM Interconnection, LLC*, 189 FERC ¶ 61,095 at P 71 (2024).

## II. The Filed-Rate and Retroactivity Doctrines

The Commission may adjust electricity rates and related regulations only prospectively. This constraint on FERC's authority rests on two related principles: the filed-rate doctrine and the rule against retroactive ratemaking. The filed-rate doctrine is grounded in provisions of the Federal Power Act that require regulated entities (like PJM) "to charge only the rates filed with FERC and to change their rates only prospectively." *Okla. Gas*, 11 F.4th at 829. That statutory prohibition on retroactive changes to the filed rate "is not limited to 'rates' *per se*"; it also "extends to matters directly affect[ing] . . . rates" — such as the EER auction-participation rule at issue here. *Id.* (cleaned up) (quoting *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966–67 (1986)). The scope of the doctrine is consistent with the Act's broad language requiring regulated entities to publicly file proposed changes in any "rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto." 16 U.S.C. § 824d(d).

The rule against retroactive ratemaking is a "corollary" and "logical outgrowth" of the filed-rate doctrine. *SFPP, L.P. v. FERC*, 967 F.3d 788, 801, 802 (D.C. Cir. 2020). It generally "prohibits the Commission from adjusting current rates to make up for a utility's over- or under-collection in prior periods." *Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1227 (D.C. Cir. 2018).

Together, the "filed rate doctrine and the rule against retroactive ratemaking leave the Commission no discretion to

waive the operation of a filed rate or to retroactively change or adjust a rate for good cause or for any other equitable considerations." *Old Dominion Elec.*, 892 F.3d at 1230; *see also Okla. Gas*, 11 F.4th at 829–30 (noting that the doctrines are "nearly impenetrable shield[s]" that do "not yield, no matter how compelling the equities"). Strict application of those principles gives effect to Congress's command for FERC to ensure predictable and stable electricity rates. *NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 800 (D.C. Cir. 2007); *see also PJM Power Providers Grp. v. FERC*, 96 F.4th 390, 402 (3d Cir. 2024) ("FERC has no authority to disregard Congress's will" in achieving predictable auction rules.); *cf. Pub. Utilities Comm'n of Cal. v. FERC*, 894 F.2d 1372, 1383 (D.C. Cir. 1990) (The Natural Gas Act's ban on retroactive ratemaking "reflects a congressional determination that parties in the industry need to be able to rely on the finality of approved rates, and that this interest outweighs the value of being able to correct for decisions that in hindsight may appear unsound.").

In evaluating the retroactivity of a tariff provision approved by FERC, courts look to the Supreme Court's decision in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), for guidance. *See, e.g.*, *PJM Power Providers*, 96 F.4th at 398 (noting that the Federal Power Act does not define "retroactivity" and drawing on *Landgraf*). *Landgraf* explains that a law or regulation is retroactive if it "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." 511 U.S. at 269 (cleaned up). A regulation does not have retroactive effect "merely because it is applied in a case arising from conduct antedating the [regulation's] enactment, . . . or upsets expectations based in prior law." *Id.* Rather, the critical question is whether the new provision "attaches new legal consequences to events completed before

its enactment." *Id.* at 270; *see also Bd. of Cnty. Comm'rs v. EPA*, 72 F.4th 284, 292–93 (D.C. Cir. 2023) ("[R]etroactive rules alter the past legal consequences of past actions.").

*Landgraf* instructs that the "conclusion that a particular rule operates retroactively comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." 511 U.S. at 270 (cleaned up). The analysis is therefore "fact-intensive," Shambie Singer, *Sutherland Statutory Construction* § 41:4 (8th ed. 2018), and informed by "familiar considerations of fair notice, reasonable reliance, and settled expectations," *Landgraf*, 511 U.S. at 270.

### III. Analysis

In my view, PJM's 2024 tariff amendment is impermissibly retroactive and violates the filed-rate doctrine to the extent that it strips Affirmed of its entitlement to bid its EERs in the 2026/27 and 2027/28 delivery-year auctions — an entitlement that attached when Affirmed's EERs cleared the 2023/24 and 2024/25 delivery-year auctions. Under *Landgraf*, the 2024 tariff amendment "takes away or impairs" Affirmed's "vested right" to bid in subsequent auctions, which was "acquired under [the] existing [tariff]." 511 U.S. at 269 (cleaned up). The amendment also "attaches a new disability . . . in respect to transactions or considerations already past." *Id.* The "past" events were the 2023/24 and 2024/25 delivery-year auctions, in which Affirmed earned the right to participate in subsequent auctions by clearing its EERs.

Under *Landgraf*, the retroactivity analysis turns on whether PJM's pre-existing tariff attached a past legal consequence to a past action. That inquiry begins with interpreting the tariff's

"plain meaning," understood through both "its text and context." *Okla. Gas*, 11 F.4th at 827. The relevant tariff provision here, Section L.4, plainly states that an EER that "clears an auction for a Delivery Year may be offered in auctions for up to three additional consecutive Delivery Years, but shall not be assured of clearing in any such auction." J.A. 61. The guarantee of three subsequent years of auction participation is so clear that my colleagues in the majority "do not doubt that under Section L.4's plain meaning, Affirmed obtained permission to bid at up to four consecutive auctions." Maj. Op. at 14.

*Landgraf* notes that the fact-intensive retroactivity analysis is informed by "familiar considerations of fair notice, reasonable reliance, and settled expectations." 511 U.S. at 270. Here, the multi-year participation provision in Section L.4 was intended to provide an incentive for EER suppliers to participate in PJM's capacity auctions and to more accurately account for the contributions of EERs to the electricity market. Because EERs provide ongoing reductions in demand for future delivery years, FERC determined that EER "providers should have the ability to obtain the full economic benefits of their investments" by participating in up to four auctions. 2009 Order, 126 FERC ¶ 61,275 at P 137. FERC's 2009 Order and the tariff itself thus set the expectation that EER suppliers would be granted multi-year participation in capacity auctions if their EERs cleared an initial auction. In other words, that expectation was embodied in the filed rate.

The tariff's multi-year auction provision, approved by the 2009 Order, drove Affirmed to substantially invest in EERs and to bid them in the 2023/24 and 2024/25 delivery-year auctions. In executing its business plan and formulating its bids, Affirmed relied on Section L.4's guarantee that if its EERs cleared an auction, Affirmed would secure multi-year

eligibility to offer the continued energy savings from those EERs in three consecutive auctions. Critically, Affirmed submitted EER bids that cleared the auctions for the 2023/24 and 2024/25 delivery years. Affirmed's settled expectation *at the time of clearance* was that it would be permitted to participate in the next three capacity auctions.

Despite the plain meaning of Section L.4 and Affirmed's reliance on it, my colleagues in the majority conclude that the 2024 amendment that bars EERs from PJM's capacity auctions operates only prospectively in this case. Maj. Op. at 16–19. They reason that the 2024 amendment does not disturb Affirmed's past entitlement but instead merely frustrates Affirmed's expectations of participating in future auctions. *Id.* Although the difference between a "past entitlement" and a mere "expectation" is not easy to parse, my colleagues do not attempt to explain why they view the change to PJM's tariff as "prospective" as applied to Affirmed, when Affirmed's right to participate in future auctions ripened in the past — *i.e.*, during the auctions for the 2023/24 and 2024/25 delivery years.

As I see it, the key facts before us are that (1) Affirmed's right to bid its EERs in the 2026/27 and 2027/28 delivery-year auctions vested when its EERs cleared the 2023/24 and 2024/25 delivery-year auctions; (2) the filed-rate doctrine safeguards Affirmed's reliance on Section L.4 of the operative tariff, which PJM filed and FERC approved; and (3) the prohibition against retroactive rate-making and general principles of retroactivity further constrain the ability of PJM and FERC to alter the tariff to the extent that it affects a "past legal consequence" — here, the vesting of Affirmed's rights when its EERs cleared past auctions.

The cases cited by my colleagues in their analysis of the retroactivity issue are factually and legally distinguishable.

None of them addresses a situation where a change in regulatory policy altered a past legal consequence — *i.e.*, where a legal right was conferred on the petitioning party in the past but was stripped away by the new rule. Instead, the majority's cited cases largely address circumstances where companies made business decisions based on their understanding of certain rules that later changed, thereby upsetting the companies' expectations. The critical distinction here is that Affirmed's EERs already cleared auctions for the 2023/24 and 2024/25 delivery years, and the operative tariff guaranteed that Affirmed therefore would be entitled to bid those EERs in the 2026/27 and 2027/28 delivery-year auctions. The cases cited by the majority would be more on point if Affirmed had not cleared any auctions in the past but argued that it should be allowed to participate in the next auction because it had invested time and money to prepare a bid in reliance on the terms of the pre-existing tariff. But instead, Affirmed's past clearing bids resulted in a past legal consequence — the right to bid again — that sets this case apart. It is also notable that my colleagues rely on cases involving the Federal Communications Commission ("FCC") that do not involve filed rates or the application of the filed-rate doctrine, even though the filed-rate doctrine constrains FERC's ability to change the terms of the tariff at issue in this case.

My colleagues principally rely on *DIRECTV, Inc. v. FCC*, 110 F.3d 816 (D.C. Cir. 1997). There, we addressed whether the FCC had retroactively divested permittees of a right to receive satellite channels. *Id.* at 821. Initially, the FCC issued an order that reserved for permittees "the first right" to a *pro rata* share of any additional channels that might later be surrendered or canceled. *Id.* at 822. Years later, the FCC canceled and reclaimed a forfeited channel. The agency, however, abandoned "its existing, but never implemented, policy of reassigning channels on a *pro rata* basis among

existing permittees . . . ." Respondents' Brief at 6, *DIRECTV*, 110 F.3d 816 (No. 96-1001). Instead, when it reclaimed the forfeited channel, the FCC announced its decision to adopt a new rule reallocating the forfeited channel through a competitive auction. *Id.* We rejected the permittees' retroactivity claim because the FCC's former *pro rata* policy did not grant them "the right to any specific channel." *DIRECTV*, 110 F.3d at 826. Rather, the former policy had prospectively established "the Commission's plan for the distribution of reclaimed channels, should there ever be any." *Id.*

*DIRECTV* is inapposite because it involved a prospective policy that the agency announced but never implemented. Here, by contrast, the relevant provision of the 2009 tariff was in effect for fifteen years until PJM decided to change it. Moreover, the permittees in *DIRECTV* took no action that triggered an obligation by the FCC; but in the instant case, Affirmed succeeded in clearing two capacity auctions with its EERs, and that obligated PJM to allow it to participate in up to three more auctions. Although the permittees in *DIRECTV* made unilateral business decisions to spend "millions of dollars building satellites . . . for more channels," that action had no legal consequence under the agency's policy. 110 F.3d at 826. Thus, the permittees' business decision rested solely on an "expectation[]" that the FCC would implement the *pro rata* policy. *Id.* But here, PJM's tariff amendment operated retroactively because it was "substantively inconsistent with a prior agency practice and attache[d] new legal consequences to events completed before its enactment" — *i.e.*, the amendment deprived Affirmed of a right that it had already secured when its EERs cleared in past auctions. *Arkema Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010) (cleaned up).

Similarly, *National Cable & Telecommunications Ass'n v. FCC* ("*NCTA*") is not analogous because it also involved a straightforward case of upsetting business expectations. 567 F.3d 659 (D.C. Cir. 2009). In *NCTA*, the FCC banned exclusivity agreements between cable companies and owners of apartment buildings due to the agreements' anticompetitive effects. *Id.* at 662. The petitioners challenged the rule by arguing, in relevant part, that the ban's application to existing contracts was retroactive. *Id.* at 670. We rejected that argument, noting that "[i]t is often the case that a business will undertake a certain course of conduct based on the current law, and will then find its expectations frustrated when the law changes." *Id.* (quoting *Chem. Waste Mgmt. v. EPA*, 869 F.2d 1526, 1536 (D.C. Cir. 1989)). Such a change in the law that merely upsets expectations is not retroactive. But we reaffirmed in *NCTA* that altering "past legal consequences of past actions" would be. *Id.* As discussed, the key fact in the case before us is that Affirmed's entitlement to participate in the auctions for the 2026/27 and 2027/28 delivery years was a "past legal consequence" of its "past action" of submitting clearing bids in the 2023/24 and 2024/25 delivery-year auctions.

Likewise, my colleagues' reliance on *Mobile Relay Associates v. FCC*, 457 F.3d 1 (D.C. Cir. 2006), is misplaced. In *Mobile Relay*, we rejected a retroactivity challenge to the FCC's decision to reconfigure portions of a radio spectrum, which incidentally impaired the petitioners' ability to use their spectrum licenses. *Id.* at 10. The petitioners argued that, when they purchased their licenses at an auction, the FCC had advertised certain features that allowed "future flexible use," which was "one of the economically advantageous assets of the license." Petitioners' Brief at 11, *Mobile Relay*, 457 F.3d 1 (No. 04-1413). We held that the FCC's reconfiguration decision that made the licenses less advantageous posed no

retroactivity concern because the petitioners' purchase of the licenses created only a contingent expectation — not a fixed legal entitlement — that the FCC's licensing regime would continue to permit flexible operations indefinitely. *Mobile Relay*, 457 F.3d at 10–11. The FCC's reconfiguration decision prospectively affected future operations and did not alter the legal effect of any past event because the petitioners' licenses did not make any guarantees or promises about the configuration of the spectrum. That, of course, is very different from the situation now before us, where Section L.4 of the pre-existing tariff guaranteed Affirmed's entitlement to participate in future auctions once its EERs cleared an initial auction.

Notably, we observed in *Mobile Relay* that the FCC's licensing scheme did not, by itself, create vested rights or otherwise trigger fixed legal consequences based on the terms of the licenses because "the [FCC] has the unilateral authority, provided it gives notice to the licensee, to modify a license 'either for a limited time or for the duration of the term thereof, if in the judgment of the Commission such action will promote the public interest, convenience, and necessity.'" 457 F.3d at 12 (quoting 47 U.S.C. § 316(a)(1)); *see also Celtronix Telemetry, Inc. v. FCC*, 272 F.3d 585, 589 (D.C. Cir. 2001) (The FCC "always retain[s] the power to alter the term of *existing* licenses by rulemaking." (emphasis added)). That statutory backdrop stands in stark contrast to the regulatory scheme that we consider here. The Communications Act authorizes the FCC "to modify a license" midstream, "if in the judgment of the Commission such action will promote the public interest, convenience, and necessity," *Mobile Relay*, 457 F.3d at 12 (quoting 47 U.S.C. § 316(a)(1)); but the tariff amendment in the instant case was subject to the filed-rate doctrine, which "leave[s] the Commission no discretion to waive the operation of a filed rate or to retroactively change or adjust a rate for good cause or for any other equitable

considerations," *Old Dominion Elec.*, 892 F.3d at 1230. Although my colleagues mention that courts have applied the filed-rate doctrine "across the spectrum of regulated utilities," Maj. Op. at 18 n.2, they fail to acknowledge that the filed-rate doctrine "does not have a life of its own. Its application depends on the underlying statute," *Towns of Concord, Norwood, & Wellesley v. FERC*, 955 F.2d 67, 73 (D.C. Cir. 1992). In this instance, the specific features of the governing statutes are critical, and they make *Mobile Relay* inapt because the FCC in that case was not subject to the same constraints that bind FERC in this case.[3]

In sum, the FCC cases cited by my colleagues shed little light on the question of retroactivity in the present context. To my mind, the most analogous case is *Arkema*, which more precisely addresses the meaning of "past legal consequence." 618 F.3d at 7. There, the EPA's former rule allowed companies to permanently transfer their baseline allowances of hydrochlorofluorocarbons production. *Id.* at 4. Under that rule, the petitioner completed a permanent transfer of its baseline allocation, which the EPA approved. *Id.* at 7. The EPA later amended its rule and refused to honor the previously approved transfer. *Id.* at 3. We held that the new rule operated retroactively because it sought to "undo these completed transactions." *Id.* at 9. As we explained, "[t]he Agency's approval and acknowledgment of Petitioners' actions distinguish[] this case from situations where a company's

---

[3] To be sure, Title II of the Communications Act, 47 U.S.C. § 203, requires common carriers to publicly file their rates and tariffs with the FCC, subject to the filed-rate doctrine. *Am. Tel. & Tel. Co. v. Cent. Off. Tel., Inc.*, 524 U.S. 214, 221–22 (1998). But the cases cited by my colleagues do not involve the rates filed by regulated parties and instead primarily consider the FCC's broader regulatory authority to manage licenses under Title III of the Communications Act, 47 U.S.C. §§ 301, 316.

unilateral business expectations are thwarted by a change in the regulatory framework." *Id.* at 8. Similarly here, FERC approved — and PJM implemented — a tariff that authorized EERs' participation in auctions and conferred multi-year eligibility once a resource cleared the first auction. This "successive iteration in a long-running regulatory regime" remained in effect for fifteen years. *Id.* at 9. Refusing to honor Affirmed's vested entitlement to bid the continued energy savings from its cleared EERs will "undo what [FERC] had, in practice, approved under the" 2009 tariff. *Id.* Heeding *Landgraf*'s directive to assess the nature and extent of the tariff amendment's change, this case is most similar to *Arkema*: PJM's 2009 tariff operated to approve and acknowledge Affirmed's right to participate in the auctions for the 2026/27 and 2027/28 delivery years; Affirmed's right to bid in subsequent auctions was a legal consequence of its successful EER bids in earlier auctions; and the 2024 amendment sought to "undo [those] completed transactions." *Id.*

\* \* \*

For the foregoing reasons, I would grant Affirmed's petition in part and vacate FERC's approval of PJM's 2024 tariff amendment to the extent that it deprives Affirmed of its vested right to participate in the capacity auctions for the 2026/27 and 2027/28 delivery years. My fact-bound conclusion does not suggest, as PJM and FERC claim, that utilities may never amend their tariffs. What distinguishes this case is the vesting of Affirmed's right to bid its EERs in specific future auctions, under the terms of the tariff provision at issue. I agree with my colleagues' conclusion that FERC may otherwise approve PJM's proposed tariff amendment and that it may operate prospectively. I disagree only with the retroactive divestment of Affirmed's entitlement to participate

in the 2026/27 and 2027/28 auctions.  I thus respectfully dissent from Section II.A of the majority opinion.